**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| QCX LLC d/b/a Polymarket US,<br><br>*Plaintiff*,<br><br>vs.<br><br>LETITIA JAMES, in her official capacity as Attorney General of New York; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission,<br><br>*Defendants*. | Case No.: 26-cv-8345<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This action seeks to prevent imminent and irreparable harm arising from New York's enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement Congress has expressly prohibited. Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Through the Commodity Exchange Act ("CEA"), Congress vested the CFTC with sole regulatory

authority over event contracts and other derivatives traded on designated contract markets. Exercising this comprehensive, exclusive authority, the CFTC regulates exchange-traded event contracts and decides whether to prohibit certain event contracts as contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C).

2. The threat to Polymarket US is immediate and concrete. Defendants have asserted that federally regulated event-contract trading is "unregulated gambling."[1] Based on that erroneous theory, Defendants have pursued crushing civil and criminal penalties against three other CFTC-regulated entities that offer event contracts, each time accompanied by a temporary restraining order.[2] This is an extraordinary assertion of state power squarely foreclosed by federal law. Polymarket US therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, potential criminal liability, forced cessation of operations within New York, and severe collateral consequences to its nationwide operations.

3. The harm resulting from state enforcement would be irreparable. Even a meritless state enforcement action would immediately disrupt Polymarket US's federally

---

[1] *See, e.g.*, *Consumer Alert and Industry Alert: Attorney General James Warns New Yorkers of Potential Harms of Sports Betting and Prediction Markets*, OFF. N.Y. STATE ATT'Y GEN. (Feb. 2, 2026), https://ag.ny.gov/press-release/2026/consumer-alert-and-industry-alert-attorney-general-james-warns-new-yorkers ("Prediction markets may appear as modern, high-tech platforms for speculation or 'forecasting,' but in practice, many operate as unregulated gambling.").

[2] Verified Petition, *New York v. KalshiEX LLC*, 1:26-cv-06550 (S.D.N.Y. July 31, 2026), Dkt. 1-1 ("Kalshi Pet."); Petitioner's Memorandum of Law in Support of the Verified Petition and Order to Show Cause, *New York v. KalshiEX LLC*, 1:26-cv-06550 (S.D.N.Y. July 31, 2026), Dkt. 1-2; Verified Petition, *New York v. Coinbase Fin. Mkts., Inc.*, 451604/2026 (N.Y. Sup. Ct. Apr. 21, 2026), Dkt. 1 ("Coinbase Pet."); Petitioner's Memorandum of Law in Support of the Verified Petition and Order to Show Cause, *New York v. Coinbase Fin. Mkts., Inc.*, 451604/2026 (N.Y. Sup. Ct. Apr. 21, 2026), Dkt. 2; Verified Petition, *New York v. Gemini Titan, LLC*, 451603/2026 (N.Y. Sup. Ct. Apr. 21, 2026), Dkt. 1 ("Gemini Pet."); Petitioner's Memorandum of Law in Support of the Verified Petition and Order to Show Cause, *New York v. Gemini Titan, LLC*, 451603/2026 (N.Y. Sup. Ct. Apr. 21, 2026), Dkt. 2.

authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, and harm New York residents. Even the *threat* of enforcement forces Polymarket US to choose between exercising its federal right to operate nationwide and submitting to unlawful state coercion. The resulting disruption to a nationally uniform market cannot be remedied through damages. And the chilling effect on lawful activity and the deprivation of New York residents' access to a federally regulated exchange are precisely the harms Congress sought to prevent when it vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets.

4. Any enforcement action by New York *would* be meritless. In 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over certain derivatives "traded or executed on a contract market designated" under the Act. 7 U.S.C. § 2(a)(1)(A). Since then, "the courts have held that § 2(a)(1) of the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d. Cir. 1980). And Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets. As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

5. New York's enforcement actions against other prediction markets are part of a spate of state efforts to undermine the CFTC's exclusive jurisdiction. Currently engaged in a multi-state campaign to defend that jurisdiction, the CFTC has sought injunctions here and against regulators in other jurisdictions that are attempting to interfere with designated contract markets' operations. *See, e.g.,* Mot. for Prelim. Inj., *United States v. New York,* No. 1:26-cv-

03404 (S.D.N.Y. May 1, 2026), Dkt. 34 ("CFTC N.Y. PI Mot."). The CFTC has already obtained preliminary injunctions barring state enforcement against CFTC-regulated prediction markets in multiple jurisdictions. *See United States v. Minnesota*, 2026 WL 2150211, at *10–15 (D. Minn. July 27, 2026); *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026).

6. Defendants suffer no cognizable harm from being barred from enforcing laws in a domain Congress explicitly removed from state control. The State's local interests are already governed and safeguarded by the CFTC's exclusive federal oversight. By contrast, absent judicial intervention, New York's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect.

7. For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, maintain the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.

**JURISDICTION AND VENUE**

8. This is an action for declaratory and injunctive relief brought under the Supremacy Clause of the United States Constitution (including in reliance on this Court's equitable powers under Ex parte Young, 209 U.S. 123 (1908)). The federal question presented is whether New York state law—including New York State Constitution Article I, Section 9, Penal Law §§ 225.05, 225.10, and 225.20, and various provisions of the New York Racing, Pari-Mutuel Wagering and Breeding Law ("New York Racing Law")—that purports to regulate or prohibit Polymarket US's activities governed exclusively by federal law or otherwise conflicts with federal law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.* This Court

has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 2201, and 2202.

9. This Court has personal jurisdiction over Defendants. Defendants are domiciled and perform their duties in New York.

10. Venue is proper in this district under 28 U.S.C. § 1391(b). All Defendants are residents of the State of New York. Polymarket US is headquartered in this District. And a substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

11. Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York. Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts. Polymarket US is a contract market that is federally licensed and regulated by the CFTC pursuant to the CEA.

12. Defendant Letitia James is Attorney General of the State of New York. This suit is brought against Attorney General James in her official capacity.

13. Defendant Brian O'Dwyer is the Chair and Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner O'Dwyer in his official capacity.

14. Defendant John A. Crotty is a Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner Crotty in his official capacity.

15. Defendant Sylvia B. Hamer is a Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner Hamer in her official capacity.

16. Defendant Martin J. Mack is a Commissioner of the New York State Gaming

Commission. This suit is brought against Commissioner Mack in his official capacity.

17. Defendant Peter J. Moschetti, Jr., is Vice Chair and a Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner Moschetti in his official capacity.

18. Defendant Marissa Shorenstein is a Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner Shorenstein in her official capacity.

19. Defendant Jerry Skurnik is a Commissioner of the New York State Gaming Commission. This suit is brought against Commissioner Skurnik in his official capacity.

20. Defendant Robert Williams is the Executive Director of the New York State Gaming Commission. This suit is brought against the Executive Director in his official capacity. As Executive Director, Defendant Williams is responsible for administering the Gaming Commission's orders. *See* N.Y. Racing Law § 103; N.Y. Comp. Codes R. & Regs. tit. 9, §§ 4001.1, 4401.1.

21. Defendants O'Dwyer, Crotty, Hamer, Mack, Moschetti, Shorenstein, Skurnik, and Williams have the power and duty to enforce New York gaming laws, including the laws preempted by federal law.

## FACTUAL AND LEGAL BACKGROUND

### A. Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.

22. This case is about derivatives—financial instruments that derive their value from an underlying asset or event. Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

23. One common kind of derivative is a "swap." Swaps are financial contracts where two parties agree to exchange, or swap, payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

24. An event contract, in turn, is a swap that is settled "based on the outcome of an underlying occurrence or event." CFTC, *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,807 n.1 (June 12, 2026); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts."); *Johnson*, 2026 WL 1223373, at *3–4 ("Event contracts satisfy both elements" of the CEA's definition of "swap").

25. Event contracts allow participants "to manage price risks around whether events stated in the contracts will occur." 91 Fed. Reg. 35,806, 35,807.

26. Events "may relate to economics, or elections, or climate, or sports, or anything else of potential financial, economic, or commercial consequence." *See, e.g.*, Complaint ¶ 3, *United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. 1.

27. "[Event] contracts are not novel innovations." Amicus Brief of CFTC at 7, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 ("CFTC Amicus Br."). "'Since 1992, the Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on' events 'as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events.'" *Id.* (quoting 73 Fed. Reg. 25,669, 25,671 (May 7, 2008)). In 1993, for example, the Commission authorized the Iowa Electronic Markets to list contracts pegged to presidential elections. *Id.* at 7–8. In 2004, "the Commission first designated a prediction market as a designated contract market." 91 Fed. Reg. 35,806, 35,807.

28. Event contracts often have a "binary payoff structure." 91 Fed. Reg. 35,806,

35,807 n.1. One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position). The terms of the contract specify its payout and expiration date. For example, the parties might take a position on whether Albany will get more than 3.3 feet of rain (the approximate yearly average) in 2026. At the end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not. If 2026 turns out to be an especially wet year and Albany sees 4 feet of rain, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

29. Event contracts have any number of uses. For example, they can be used to "address[] categories of risk for which traditional financial instruments either do not exist or provide only imperfect hedges." 91 Fed. Reg. 35,806, 35,866. A hardware store in Albany might purchase an event contract predicting that the city will have a particularly dry year. If the weather turns out as the owner predicted, the payout from the contract could offset the owner's loss of income from replacement gutters. *See Johnson*, 2026 WL 1223373, at *5 ("[W]eather events produce commercial consequences for a wide range of market participants.").

30. Event contracts can have enormous predictive value. Because they may be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome. Consider a contract that pays out $1 based on whether the Knicks will win another NBA championship. As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the contract's value. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. When the outcome seems less likely, the opposite will

occur: Demand for "yes" positions will drop, and the price will drop with it. The result is that the price of the contract will reflect the overall market's view, in real time, about the probability of the outcome. And those probabilities are set by trading activity, not unilaterally fixed odds.

31. As the CFTC observed in its recent Notice of Proposed Rulemaking, prediction markets "are rapidly increasing in popularity with the American public both as a financial asset class and as a source of reliable information for news media, sports leagues, financial institutions, and everyday Americans." 91 Fed. Reg. 35,806, 35,807. They generate valuable public information about the most important real-world events—finance, weather, news, technology, and sports, to name a few. Because traders put capital at stake, prediction markets incentivize accurate predictions. And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls.

32. When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts. *E.g.*, M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[3]

33. The same is true of elections. For example, although pollsters initially dismissed Zohran Mamdani as a candidate in the New York Democratic mayoral primary, prediction markets accurately predicted Mamdani's eventual victory.[4]

---

[3] https://tinyurl.com/2zm5axpc.

[4] Newsweek, *Zohran Mamdani's Chances of Beating Eric Adams, According to Polls* (June 25, 2025), https://www.newsweek.com/zohran-mamdani-chances-beating-eric-adams-new-york-mayor-odds-polymarket-polls-2090431; Vince Dioquino, *Polymarket Nails NYC Democratic Mayoral Primary Upset, Nears $1B Unicorn Valuation*, Decrypt (June 25, 2025), https://decrypt.co/326892/polymarket-nails-nyc-democratic-mayoral-primary-upset-nears-1b-unicorn-valuation.

34. Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to trade; more participants mean more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large.

**B. Over the past century, federal regulation of exchange-traded derivatives has become extensive—and exclusive.**

35. For about as long as derivatives trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling. "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

36. The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

37. Congress buttressed this federal scheme a decade later with the CEA but initially left the States a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947).

38. By the 1970s, however, exchanges had become too important to the national

economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41,333 (1973). So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Merrill Lynch*, 456 U.S. at 356, "to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC," *Flaherty*, 172 F.4th at 230.

39. To that end, Congress provided that the CFTC would regulate "all" commodity futures when traded on a CFTC-designated contract market. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). Congress granted the CFTC "*exclusive jurisdiction* with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A) (emphasis added). "The purpose of this was to separate the functions of the new CFTC from those of the SEC and other regulators," including state regulators. *Leist*, 638 F.2d at 314; *see Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980) ("Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states."). As the CFTC itself has explained, "[p]reemption was an express goal of the CFTC Act." CFTC Amicus Br. 7.

40. Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority. *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord*, *e.g.*, *Leist*, 638 F.2d at 322; *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

41. State officials protested this change. A state securities commissioner from

Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 363–64 at 383 (1978). By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states." *Id.* And another Secretary of State demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.

42. Congress reaffirmed the preemptive effect of the CFTC's exclusive jurisdiction in 1982. When amending federal securities laws to preempt state gaming laws, members of Congress explained that a similar amendment to the CEA was unnecessary: "Similar application of state laws would not apply to futures contracts," because "the CEA gives the CFTC exclusive jurisdiction over futures trading thereby preempting state anti-gaming and bucket shop laws, as well as other state laws." H.R. Rep. No. 97-626, pt. 1, at 9 (June 24, 1982) (Conf. Rep.).

43. In 2000, Congress broadened the statutory definition of "commodity" to include any "occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, § 101(4), 114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)).

44. Following the 2008 financial crisis, Congress again changed the regulatory landscape. The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

45. *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction. As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A); *see also* Motion for Preliminary Injunction at 10–11, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 8, 2026) ("CFTC Arizona PI Mot."), Dkt. 49.

46. Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

47. *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC with the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). "By creating a specific public-interest review process, Congress signaled that these contracts belong within the [CFTC]'s exclusive regulatory purview, not the States'." Complaint ¶ 54, *United States v. Arizona*, No. 2:26-cv-0224 (D. Ariz. Apr. 2, 2026), Dkt. 1 ("Arizona Compl.").

48. Were there any doubt, Congress vested the CFTC with "exclusive authority to enforce" Dodd-Frank's swaps provisions, including the Special Rule governing event contracts. 7 U.S.C. § 6b-1(a). All told, the CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether they involve "gaming," and to prohibit them based on the CFTC's view of the public interest. 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C). And a "purpose of the CEA is to promote responsible innovation," albeit under the

watchful eye of the CFTC. 91 Fed. Reg. 35,806, 35,829.

**C. The CEA sets forth the comprehensive regulatory framework for event contracts.**

49. The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework. Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a). That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

50. The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles." 17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a). Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2). And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

51. The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts. *See* 17 C.F.R.

§§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). These rules, the CFTC has explained, "establish important protections for derivatives markets, market participants, and the general public." Complaint ¶ 36, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. 1 ("CFTC N.Y. Complaint").

52. In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate. As the CFTC has explained, contract markets are "self-regulatory organizations[] subject to Commission oversight" that must "meet stringent requirements" under the CEA. 91 Fed. Reg. 35,806, 35,843; *see* 7 U.S.C. § 5(b) (purpose of the CEA is to "serve the public interest[] . . . through a system of effective self-regulation of trading facilities"); *see also* Complaint ¶¶ 33–37, *United States v. Wisconsin,* No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. 1 ("Wisconsin Compl.").

53. Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The most common method of certification is known as self-certification. Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with

accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

54. Self-certification is permissible only because "self-regulatory organizations such as contract markets possess a form of delegated" government authority, *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022), a privilege earned only after demonstrating the extensive regulatory compliance necessary to receive CFTC designation. The CFTC retains authority to investigate, stay, or amend the contract even after it has been listed. 17 C.F.R. § 40.2(c).

55. More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement, restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D. The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

56. The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations. Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).

57. Today, Polymarket US specializes in contracts concerning real-world events of public interest. Since September 30, 2025, Polymarket US has self-certified various financial,

election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products (listing self-certifications for contracts).[5]

58. These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

59. One example is event contracts based on which political party will control the United States Senate or United States House of Representatives following the November 3, 2026, elections. Businesses, investors, financial institutions, and consumers routinely adjust their behavior based on which party will control Congress because legislative control can affect taxation, spending, regulation, and other matters with significant economic effects.

60. Another example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii). Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike. In 2025, for example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize on the team's success.[6] Retailers also regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[7]

---

[5] https://tinyurl.com/yamausyk.

[6] *See* https://phl17.com/phl17-news/eagles-to-generate-1-2b-economic-impact-with-super-bowl-parade-season/; https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/.

[7] *See*, *e.g.*, *Buffalo Wild Wings (@bwwings),* Instagram (Feb. 8, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); *Boston College, Los Amigos Taco Time,* https://bceagles.com/sports/2023/4/14/in-game-promotions (last visited Feb. 8, 2026) (awarding fans a free taco every time the Boston College Men's Basketball Team

61. Sports-related event contracts are not the same as sportsbooks. The financial products and regulatory regimes differ in fundamental ways.

62. Event-contract prices are formed by matching buyers and sellers among diverse market participants on these national exchanges. Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers. The incentives in sports betting and derivatives markets are different. Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on a given event. And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the gambling transaction. But Polymarket US does not operate as a counterparty in the derivatives market. Instead, it operates as a transparent, centralized exchange matching orders of third parties. Polymarket US makes money by charging a flat fee for each transaction; unlike a sportsbook, it does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event.

63. Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets. That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures. Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national

---

scores 70 points); *Boston Celtics, Miss for McDonald's,* https://www.nba.com/celtics/promotions/mcdonalds/miss-for-mcdonalds (last visited Feb. 8, 2026) (awarding free fries whenever a visiting team misses at least one free throw during the fourth quarter of a Boston Celtics game); *Little Caesars, Little Caesars Road to the Super Bowl Sweepstakes,* https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL%20Super%20Bowl%202026%20Sweepstakes.pdf (last visited Feb. 8, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform).

public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities." *Id.*

64. In contrast, sportsbooks operate under the auspices of state law. And because sports gambling is regulated on a state-by-state basis, sportsbooks tend to be local operations governed by local laws. *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1302 (3d Cir. 1996).

### E. The CFTC has vigorously defended its exclusive jurisdiction over designated contract markets.

65. The CFTC has resisted States' attempts to encroach upon its exclusive jurisdiction over designated contract markets. It has publicly advocated for its exclusive prerogative to regulate event contracts, assertively pursued litigation, and acted as an amicus in support of private parties' fights against states' jurisdictional overreach.

66. Earlier this year, CFTC Chairman Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system."[8] He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest." *Id*. To protect its jurisdiction, he directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives." *Id.* "The CFTC will no longer sit

[8] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

idly by," he admonished, "while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products."[9]

67. The CFTC has followed through with this warning. In recent months, the Commission has sued numerous States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets.[10]

68. The CFTC explained that those state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets," and would "undermine[] [the] uniformity" Congress mandated, *see, e.g.*, CFTC N.Y. Complaint, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26 (Apr. 2, 2026). The CFTC also emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which prohibits States from "invad[ing]" that authority. *See, e.g.*, CFTC N.Y. Complaint ¶¶ 3, 6. Those federally regulated markets include Polymarket US. *See id.* ¶ 37.

---

[9] *Chairman Michael S. Selig: Op-Ed: States Encroach on Prediction Markets,* Commodity Futures Trading Comm'n (Feb 17, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

[10] *See* Complaint, *United States v. Arizona*, No. 2:26-cv-02246-DMF (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; Complaint, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1; *United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. No. 1; Mot. to Intervene & Proposed Compl. in Intervention, *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), Dkt. No. 19; Complaint, *United States v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), Dkt. No. 1; Complaint, *United States v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026), Dkt. No. 1.

69. That is why the CFTC sued New York. On April 24, 2026, the CFTC sued the State "to halt [its] efforts to apply and enforce preempted state laws to national markets that are governed by federal law," CFTC N.Y. Complaint ¶ 1, and moved for a preliminary injunction barring New York from enforcing state laws that are preempted by the CEA, CFTC N.Y. PI Mot. 1. The CFTC argues that New York is "unconstitutionally intruding on the CFTC's exclusive regulatory jurisdiction" and "violating [the Commission's] exclusive jurisdiction and the Supremacy Clause." *Id*. at 1, 9.

70. The CFTC has moved for preliminary injunctions and summary judgment, seeking to prohibit the States from pursuing criminal or civil enforcement actions against CFTC-regulated contract markets.[11]

71. In Minnesota, the court recently preliminarily enjoined Minnesota from enforcing state law against CFTC-regulated contract markets, including Polymarket US. Minnesota, 2026 WL 2150211, at *10–15. The court held that the CEA's "exclusive jurisdiction" language likely expressly preempts state regulation of event contracts that qualify as "swaps," and emphasized the breadth of that definition—an event contract qualifies where "the occurrence of an event has the capacity to result in the identified consequence in the future." *Id*. at *12–15.

[11] *See* Motion for Preliminary Injunction at 10–11, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 8, 2026), Dkt. 49; Motion for Preliminary Injunction, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 34; Motion for Preliminary Injunction, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. May 1, 2026), Dkt. 6; Motion for Preliminary Injunction, *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026), Dkt. 25; Mot. for Prelim. Inj., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 29, 2026), Dkt. 23; Mot. for Prelim. Inj., *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. June 17, 2026), Dkt. 31; Mot. for Prelim. Inj., *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 18, 2026), Dkt. 13; Mot. for Prelim. Inj., *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky. June 30, 2026), Dkt. 7 (withdrawn following agreement to proceed directly to summary judgment).

**F. The New York State Gaming Commission pursues other event-market operators for state-law penalties for federally regulated sports-event contracts.**

72. On April 21, 2026, New York sued Coinbase Financial Markets, Inc. ("Coinbase") and Gemini Titan LLC ("Gemini") in state court and sought temporary restraining orders—all apparently without sending cease-and-desist letters. More recently, on July 31, 2026, New York sued KalshiEx LLC ("Kalshi"), and similarly sought a temporary restraining order. In all three suits, New York alleged that, by making sports-event contracts available for trade in New York, these CFTC-licensed entities violate "New York's state constitution, penal laws, and other statutes," and specifically, New York State Constitution Article I, Section 9, Penal Law §§ 225.05, 225.10, 225.20, various provisions of the New York Racing Law, and the Federal Interstate Wire Act. Coinbase Pet. ¶¶ 9, 12; Gemini Pet. ¶¶ 9, 12; Kalshi Pet. ¶¶ 9, 12. New York is seeking injunctive relief, as well as restitution, disgorgement, and civil and criminal penalties. Coinbase Pet. pp. 28–29; Gemini Pet. pp. 30–31; Kalshi Pet. pp. 29–31.

73. Given the State's demonstrated practice of taking enforcement action against similarly situated operators, Polymarket US faces the imminent threat of enforcement by New York or the New York State Gaming Commission. Like Coinbase, Gemini and Kalshi, Polymarket US does not have a New York sports-gaming license—because New York may not lawfully require Polymarket US to obtain one as a condition of offering event contracts to New York users. And, similarly, although Polymarket US runs its markets in accordance with—and subject to the exclusive jurisdiction of—federal law, New York has taken the position that these activities are within the purview of state law.

**G. Looming enforcement of preempted New York law irreparably harms**

**Polymarket US's business.**

74. Given the State's definitive position—that similarly situated operators are violating New York's state constitution, penal laws, and New York Racing Law—Polymarket US faces the imminent threat of enforcement by New York.

75. The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy. Because Polymarket US must choose between protecting its rights under federal law and facing exposure to imminent state enforcement, this action is ripe for adjudication and the award of injunctive relief now, not after irreparable harm has occurred.

76. The business consequences for Polymarket US arising from New York's near-certain enforcement require this Court's immediate action. An enforcement action by New York—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth. Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

77. The alternative—abruptly terminating New York users' access to event contracts and unwinding their current positions—is just as damaging. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off New Yorkers from Polymarket US's event contracts—contracts that are available to users outside New York—would deal a decisive blow to Polymarket US's goodwill and reputation within the State. It would disrupt overall liquidity and impair the information that trading generates by forcing New York residents off the exchange. And it would create confusion among users about what shutting off their access to the market means for their trading

positions. Unwinding existing contracts, in particular, would confuse and frustrate both New Yorkers and users on the other side of the contracts.

78. Further, reduced liquidity would deter customers from using the platform. Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users). Reduced liquidity dampens both, meaning that termination of New York-based trading hinders the orderly functioning of markets nationwide and could deter customers outside New York from using the platform at all, imposing substantial burdens on interstate commerce.

79. All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge [criminal] liability," on the one hand; or "suffer the injury of obeying the [preempted] law," on the other. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). There is therefore "no adequate remedy at law." *Id.*

**COUNT I**

**(Commodity Exchange Act Preemption)**

80. Polymarket US incorporates the preceding paragraphs by reference.

81. The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

82. "[U]nder the Supremacy Clause, from which our preemption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 96, 108 (1992).

83. "Preemption can generally occur in three ways: where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005).

84. The CEA bars New York from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A. Express preemption bars New York State regulation of Polymarket US's exchange.**

85. Congress expressly preempted state regulation of event-contract trading on designated contract markets.

86. Under the CEA's express terms, the CFTC, not New York, has "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

87. Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

88. The CFTC's "exclusive jurisdiction" over trading on federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts New York's supposed jurisdiction to police those exchanges, *see Leist*, 638 F.2d at 322 ("[T]he courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 645 (2d Cir. 2005) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority" than a statute's grant of "exclusive

jurisdiction"); CFTC Amicus Br. 17 (observing that Congress's conferral of "exclusive jurisdiction" meant its "expression of preemptive intent could hardly be plainer").

89. Take, for example, New York law's definition of prohibited gambling, which the State invoked in its suits against Coinbase and Gemini, and its cease-and-desist letter to Kalshi: "A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).

90. This definition echoes the CEA's definition of a swap, which includes "any . . . transaction that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial . . . consequence." 7 U.S.C. § 1a(47)(A)(ii). When a transaction qualifies as a swap within the meaning of the CEA, the CFTC, not New York, has "exclusive jurisdiction." *Id.* § 2(a)(1)(A).

91. Though States have been arguing otherwise for over a century, event contracts and other derivatives do not constitute gambling. *See supra* ¶¶ 55–61. Regardless, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts. 7 U.S.C. § 7a-2(c)(5)(C). Thus, even if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B. Implied field preemption bars New York regulation of Polymarket US's exchange.**

92. The CEA "occupies [the] entire field of" event-contract trading on designated contract markets, such that there is "no room for state law." *Wachovia Bank*, 414 F.3d at 313.

"The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets make[] [that] clear." Arizona Compl. ¶ 69; *see* CFTC Arizona PI Mot. 17.

93. "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. And through this "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended, Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned." *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982); *supra* ¶¶ 46–52.

94. The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33,476, 33,477 (June 4, 2013)); *see supra* ¶¶ 43–46.

95. There is no room for state interference with this "comprehensive scheme." *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977). "Over the years, amendments to the CEA repeatedly reinforced the CFTC's exclusive jurisdiction over the field of futures derivatives trading," even as "'the nature of the underlying commodity'" evolved. CFTC Arizona PI Mot. at 16 (alterations adopted). Enforcement of New York's Racing Law and Article 225 of its Penal Law against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-regulated exchanges. *See*, *e.g.*,

*KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (holding that "at the very least[,] field preemption applies" to "sports-related event contracts" on a designated contract market), *aff'd*, *Flaherty*, 172 F.4th at 228.

**C. Conflict preemption bars New York regulation of Polymarket US's exchange.**

96. Conflict preemption also prevents enforcement of these New York laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also Flaherty*, 172 F.4th at 229 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed [contract markets].").

97. Consider the State's position that sports-event contracts are illegal "gaming activities." That is not the State's decision to make: The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" or "activity that is unlawful under any Federal or State law," and, if so, whether they should be prohibited as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

98. Common sense confirms all this. The Chicago Mercantile Exchange, for example, is not the MGM Grand, though a customer of either might end up losing money. But if States were free to regulate derivatives as gambling—subject to each State's rigid-yet-idiosyncratic restrictions and licensing regimes—the modern financial system would cease to function. The CEA ensures that this cannot happen.

99. The CFTC has not invoked this Special Rule to prohibit Polymarket US from listing event contracts. Therefore, Polymarket US's event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *Accord*

*Flaherty*, 172 F.4th at 226 ("The Act preempts state laws that directly interfere with swaps traded on [contract markets].").

100. More broadly, if New York attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, the State's actions would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. As the Supreme Court and Second Circuit have recognized, "[t]he purpose of the exclusive-jurisdiction clause provision" is, among other things, to "separate the functions of the [CFTC] from those of . . . other regulatory agencies," *Merrill Lynch*, 456 U.S. at 386, bringing "[a]ll commodities trading in futures . . . within federal regulation under the aegis of the [CFTC]," *Leist*, 638 F.2d at 314 (emphasis added). Permitting a New York enforcement action against Polymarket US would conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own varying laws. "This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

101. In short, New York may not enforce against Polymarket US state laws that federal law preempts.

**PRAYER FOR RELIEF**

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that New York's civil and criminal gaming, gambling, and wagering laws are preempted under the CEA as applied to Plaintiff;

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from enforcing New York's civil and criminal gaming, gambling, and wagering laws or any other state law or regulation to the extent it purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law or otherwise conflicts with federal law;

C. Any other relief within this Court's discretion that it deems just and proper.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Orin Snyder*

GIBSON DUNN & CRUTCHER LLP

Orin Snyder
Matt Benjamin
Rachel Jackson*
Amanda LeSavage
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Applications for admission forthcoming*

*Attorneys for Defendant QCX LLC, d/b/a Polymarket US.*