**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

QCX LLC d/b/a Polymarket US,

*Plaintiff*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission,

*Defendants*.

Hon. Ronnie Abrams
Case No. 1:26-cv-08345 (RA)
[rel. 1:26-cv-08338 (RA)]

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF QCX LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

BACKGROUND ........ 4

A. Congress Grants The CFTC Exclusive Jurisdiction Over Exchange-Traded Derivatives. ........ 4

B. Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts. ........ 6

C. Polymarket US Operates A CFTC-Designated Contract Market. ........ 9

D. New York Seeks To Shutter Polymarket US's Federally Regulated Exchange. ........ 10

LEGAL STANDARD ........ 12

ARGUMENT ........ 12

I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions. ........ 12

A. The CEA Expressly Preempts State Regulation Of Event Contracts Traded On CFTC-Designated Contract Markets. ........ 13

B. The CEA's Comprehensive Scheme Bars New York From Regulating The Field Of Event Contracts. ........ 23

C. New York's Attempt To Regulate Contracts Listed On Polymarket US's Contract Market Conflicts With Federal Law. ........ 24

II. Polymarket US Will Be Irreparably Harmed Without Immediate Relief. ........ 26

III. The Balance Of Equities And Public Interest Strongly Support Preliminary Relief. ........ 27

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)....................16

*Amarin Pharma, Inc. v. U.S. FDA*,
119 F. Supp. 3d 196 (S.D.N.Y. 2015)....................27

*Arizona v. United States*,
567 U.S. 387 (2012)....................23, 24

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)....................4, 20

*Buono v. Tyco Fire Prods., LP*,
78 F.4th 490 (2d Cir. 2023)....................13

*CFTC v. British Am. Commodity Options Corp.*,
560 F.2d 135 (2d Cir. 1977)....................5, 23

*Chevron USA Inc. v. Plaquemines Par.*,
608 U.S. 1 (2026)....................18

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981)....................13, 16

*Chi. Mercantile Exch. v. Deaktor*,
414 U.S. 113 (1973)....................16

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973)....................12

*Coinbase Fin. Mkts. Inc. v. Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026)....................3, 9, 17, 18, 20

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
241 F.3d 123 (2d Cir. 2001)....................16, 18

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................12, 24

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*,
2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)....................26

*FMC Corp. v. Holliday*,
498 U.S. 52 (1990)....................13

*Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*,
1982 WL 1348 (S.D.N.Y. Nov. 10, 1982)....................24

*Hartford Courant Co. v. Carroll*,
986 F.3d 211 (2d Cir. 2021)....................12

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)....................13, 15

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990)....................25

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....................23, 25

*KalshiEX LLC v. Assad*,
--- F.4th ---, 2026 WL 2543846 (9th Cir. Aug. 28, 2026)....................15, 21, 22

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024)....................16, 25

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)....................3, 15, 17, 18, 21

*KalshiEX LLC v. Schuler*,
--- F.4th ---, 2026 WL 2884087 (6th Cir. Sept. 25, 2026)....................21, 22

*KalshiEX LLC v. Williams*,
2026 WL 2017466 (S.D.N.Y. July 13, 2026)....................20, 21, 22

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)....................2, 6, 9, 15, 21, 22, 25

*Ligon v. City of New York*,
925 F. Supp. 2d 478 (S.D.N.Y. 2013)....................27

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)....................4, 5, 9

*Mississippi v. Louisiana*,
506 U.S. 73 (1992)....................13

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................3, 26

*Mullin v. Doe*,
609 U.S. 324 (2026)....................16

*Murphy v. NCAA*,
584 U.S. 453 (2018)....................13

*N. Nat. Gas Co. v. State Corp. Comm'n*,
372 U.S. 84 (1963)....................13, 24

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....................12

*Navigator Grp. Funds v. Shearson Hayden Stone Inc.*,
487 F. Supp. 416 (S.D.N.Y. 1980)....................24

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
992 F.2d 430 (2d Cir. 1993)....................27

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010)....................23

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981)....................6

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016)....................13, 21, 22

*Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)....................27

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................27

*Ricci v. Chi. Mercantile Exch.*,
409 U.S. 289 (1973)....................16

*Rice v. Bd. of Trade of City of Chi.*,
331 U.S. 247 (1947)....................5, 14

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)....................14

*Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003)....................7

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)....................27

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026)....................3, 15, 17, 18, 28

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025)....................7

*Weld v. Postal Tel. Cable Co.*,
199 N.Y. 88 (1910)....................4

**CONSTITUTIONAL PROVISIONS**

N.Y. Const. art. I, § 9....................11, 28

U.S. Const. art. VI, cl. 2....................12

**STATUTES**

7 U.S.C. § 1a(19) ....7
7 U.S.C. § 1a(47)(A) ....7, 17, 18
7 U.S.C. § 2(a)(1)(A) ....1, 7, 13, 15, 16, 23, 25
7 U.S.C. § 5(b) ....24
7 U.S.C. § 7(d) ....23
7 U.S.C. § 7a-2(c) ....8, 10, 16, 23, 25
7 U.S.C. § 7b ....23
7 U.S.C. § 8(a) ....23
7 U.S.C. § 8(b) ....23
7 U.S.C. § 9 ....23
7 U.S.C. § 13a ....23
7 U.S.C. § 13a-2 ....6, 24
7 U.S.C. § 13b ....23
7 U.S.C. § 16(e)(1)(B)(i) ....24
7 U.S.C. § 16(e)(2) ....7
15 U.S.C. § 8302(d)(1) ....7, 16, 23
15 U.S.C. § 8321(b) ....7, 16, 23
18 U.S.C. § 1084(a) ....11
31 U.S.C. § 5362(1)(E)(ii) ....20
N.Y. Exec. Law § 63(12) ....11, 28
N.Y. Penal Law § 225.05 ....11, 28
N.Y. Penal Law § 225.10 ....11, 28
N.Y. Penal Law § 225.20 ....11, 28
N.Y. Rac. Pari-Mut. Wag. and Breed. Law § 1367(16)(a) ....11, 28
N.Y. Rac. Pari-Mut. Wag. and Breed. Law § 1367-a ....11, 28

**REGULATIONS**


17 C.F.R. § 1.3 ....................................................................................................8

17 C.F.R. § 38.151(b) ....................................................................................................26

73 Fed. Reg. 25669 (May 7, 2008) ....................................................................................................8

77 Fed. Reg. 48208 (2012) ....................................................................................................9

91 Fed. Reg. 35806 (June 12, 2026) ....................................................................................................9

Further Definition of "Swap,"
RIN 3038-AF82 (Oct. 9, 2026) (notice of proposed rulemaking) ....................................2, 8, 19

Further Definition of "Swap" to Exclude Casino-Style Gambling Products,
RIN 3038-AF81 (Oct. 9, 2026) (interim final rule) ....................................8, 9, 20


**OTHER AUTHORITIES**


Amicus Brief by the CFTC, *KalshiEX LLC v. Schuler*,
No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 ....................................26

Amicus Brief by the CFTC, *KalshiEX LLC v. Williams*,
No. 26-1835 (2d Cir. Sept. 8, 2026), Dkt. 51.1 ....................................2, 21, 25

*In re Blockratize, Inc.*,
2022 WL 73864 (CFTC Jan. 3, 2022) ....................................10, 19

Brian Contreras, *Inside the Knicks' Championship Windfall: How NYC Businesses Scored More Than $380 Million*, Inc.com (June 18, 2026) ....................................18

*Consequence*, Webster's New Dictionary (2009) ....................................18

*Contingency*, Webster's New Dictionary (2009) ....................................17

*Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ....................................17

*Exclusive*, Webster's New Collegiate Dictionary (8th ed. 1974) ....................................13

*Extent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ....................................17

H.R. Rep. No. 97-626, pt. 1 (1982) ....................................6

Hr'gs Before the S. Comm. on Agric. & Forestry, 93d Cong. (1974) ....................................1, 5

Jason Burgos, *NY Knicks Report Reveals MASSIVE Revenue Increase During Legendary Title Run This Spring*, Yahoo! Sports (Aug. 13, 2026) ....................................18

*Jurisdiction*, Webster's New Collegiate Dictionary (8th ed. 1974) ....................................13

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ....................................4, 5

Motion for Preliminary Injunction, *United States v. New York*,
No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 34 ....................2, 11

Philip M. Johnson et al., Derivatives Regulation (2d ed. 2026) ....................4, 7

Pub. L. No. 74-675, § 5, 49 Stat. 1491 (1936)....................5, 14

Pub. L. No. 93-463, 88 Stat. 1389 (1974)....................5, 14

Pub. L. No. 95-405, § 15,
92 Stat. 865, 872 (codified at 7 U.S.C. § 13a-2(1)) ....................6

Pub. L. No. 106-554, § 101(4),
114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19))....................7

Pub. L. No. 111-203, § 722(a)(1)(D),
124 Stat. 1376, 1672 (2010)....................2, 7

S. Rep. No. 93-1194 (1974) ....................5

S. Rep. No. 95-850 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087....................6

State Petition, *New York v. QCX LLC*,
No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. 1-1 ....................1, 3, 11, 12, 25, 26, 28

Verified Petition, *New York v. KalshiEX LLC*,
No. 1:26-cv-06550 (S.D.N.Y. July 31, 2026), Dkt. 1-1....................11

## INTRODUCTION

New York is attempting to shut down a federally licensed national derivatives exchange—everywhere in the United States—by relabeling trading Congress authorized as "gambling." Plaintiff QCX LLC d/b/a Polymarket US operates a federally authorized, nationwide event-contract market that the Commodity Futures Trading Commission ("CFTC") licensed and supervises under the Commodity Exchange Act ("CEA"). Congress placed that market within the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). The New York Attorney General has nonetheless sued Polymarket US in state court for offering event contracts that federal law permits, seeking an order barring the company from operating "within or from New York" and *$4.6 billion* in disgorgement, treble penalties, and $100,000 fines for every alleged "offer" of a contract. Pet. Prayer ¶¶ A-K, *New York v. QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. 1-1 ("Pet."); Proposed Order to Show Cause ¶ 1(a), *id.*, Dkt. 1-3 ("OSC"); RJI Addendum at 2, Index No. 454221/2026, NYSCEF Dkt. 72 (N.Y. Sup. Ct. Sept. 25, 2026) (Spencer Decl. Ex. 10) ("RJI Addendum"). The words "or from" are the point. Polymarket US runs its market from New York, so an order forbidding it to operate "from" New York is a nationwide shutdown decreed by a single State. Polymarket US seeks a preliminary injunction to stop that unprecedented assertion of state power before it inflicts irreparable harm.

The stakes extend well beyond one exchange. This case presents a fundamental question of federal oversight of the national markets on which the economy depends: whether one State may override Congress's judgment that nationally traded derivatives answer to a single federal regulator. Congress settled that question in 1974. Congress concluded that subjecting national markets to "different State laws" would produce "total chaos," and it vested the CFTC with exclusive jurisdiction over contracts traded on designated contract markets. *Hr'gs Before the S.*

*Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark). In 2010, Congress extended that exclusive jurisdiction to swaps traded on those markets, including event contracts. *See* Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010). The architecture is deliberately simple: one national market, one regulator. New York's theory would replace it with fifty regulators and fifty vetoes, each able to shutter any CFTC-licensed exchange headquartered within its borders. If New York may do this to Polymarket US, any State may do it to any derivatives exchange in the country.

The United States has already explained as much. The CFTC sued New York in this District to enjoin enforcement of the very laws invoked here and has moved for a preliminary injunction. Compl. ¶ 69; Mot. for Prelim. Inj., *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 34 ("CFTC PI Mot."). It has told the Second Circuit that New York's campaign would "massively short-circuit" the Commission's jurisdiction and "upend national derivatives markets" in an "existential threat" to the federal regulatory system itself. Br. for the CFTC as Amicus Curiae at 10, 29, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Sept. 8, 2026), Dkt. 51.1 ("CFTC 2d Cir. Amicus Br."). And, on October 9, 2026, the CFTC published a Notice of Proposed Rulemaking expressly defining sports-, politics-, culture-, and weather-related event contracts as swaps and therefore within its exclusive jurisdiction. Further Definition of "Swap"- Inclusions, RIN 3038-AF82 (Oct. 9, 2026) (Spencer Decl. Ex. 11) ("Event Contract NPRM").

The courts that have followed the statute's text have sided with Polymarket US's position. The Second Circuit explained nearly half a century ago that Section 2(a)(1)'s grant of exclusive jurisdiction "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The Third Circuit held that sports-related event contracts traded on a CFTC-designated

market are "swaps" within the CFTC's exclusive jurisdiction and barred New Jersey from enforcing its gambling laws against them. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228, 232 (3d Cir. 2026). And, more recently, two federal district courts have granted precisely the relief sought here, enjoining Minnesota and Illinois from enforcing their gambling laws against CFTC-designated exchanges. *United States v. Minnesota,* 2026 WL 2150211, at *10-11 (D. Minn. July 27, 2026); *Coinbase Fin. Mkts. Inc. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026).

Polymarket US is therefore likely to succeed on the merits. The CEA preempts New York's enforcement action three times over. The CEA expressly preempts New York law because the grant of exclusive jurisdiction to the CFTC necessarily denies jurisdiction to the States. The CEA preempts New York law, too, because it occupies the field of derivatives trading on designated contract markets, and States may not intrude upon the uniform and comprehensive regulatory scheme that Congress enacted. And New York law is conflict preempted because Polymarket US cannot honor the CFTC's mandate of impartial nationwide access to its market by walling off New York, much less by ceasing to operate in its home State. This is an easy case. New York's Petition goes "[b]eyond sports-related events" and seeks to shut down "wagers on all types of events." Pet. ¶¶ 32, 41. No State has successfully gone this far, no court has ever endorsed it, and this Court should not be the first to hold that federal law permits it.

The remaining factors follow. The State's enforcement action is pending in this District, and the State has demanded an immediate shutdown. Polymarket US thus faces the choice the Supreme Court has deemed irreparable: "continually violate" state law and risk ruinous penalties or surrender a federally authorized business. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The equities and the public interest point the same way: New York has no legitimate interest in enforcing preempted laws, while the public has a powerful interest in the supremacy of

federal law and in the uninterrupted operation of a national market Congress placed under exclusive federal supervision.

The Court should therefore enter a preliminary injunction enjoining Defendants from enforcing New York's civil and criminal gaming, gambling, and wagering laws or any other state law or regulation to the extent it purports to regulate or prohibit Polymarket US's activities governed exclusively by or otherwise conflicts with the CEA and the CFTC's implementing regulations.

## BACKGROUND

### A. Congress Grants The CFTC Exclusive Jurisdiction Over Exchange-Traded Derivatives.

Derivatives are contracts whose value derives from something else, "such as a physical commodity, interest rate, . . . stock index," or even an "incident[] that take[s] place beyond the control of the contracting parties." Philip M. Johnson et al., Derivatives Regulation § 1.02[A], [C] (2d ed. 2026). For more than a century, they have been "of the utmost importance to the business world." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co*., 198 U.S. 236, 248-49 (1905).

Since derivatives trading has existed, States—including New York—have repeatedly attempted to regulate or prohibit it as unlawful gambling. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982); *see also*, *e.g.*, *Weld v. Postal Tel. Cable Co.*, 199 N.Y. 88, 103 (1910) (finding question of fact whether cotton futures "were mere wagering contracts"). "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 394 (1982), is a direct result of "coarse attempts" by States to regulate derivatives trading as gambling, *Christie Grain*, 198 U.S. at 247-48.

When Congress originally enacted the CEA in 1936, it did not prevent state involvement.

The Act originally provided it would not "'impair'" the enforcement of "'any State law applicable to any transaction'" covered by the Act. *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947) (quoting Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936)). And because it contained no "declaration by Congress" that the regulatory system was "exclusive of state regulation," States remained free to "supplement[] or bolster[]" the federal scheme. *Id.* at 253, 255.

By the 1970s, however, derivatives trading had become too important to the national economy; allowing "different State laws" to continue regulating nationwide exchanges would lead to "total chaos." *Hr'gs Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark). Congress responded by enacting the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974). That Act created the CFTC, empowered it to regulate commodity futures, and established "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Curran*, 456 U.S. at 355-56; *accord CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 138 (2d Cir. 1977).

The 1974 Act made two changes that would reshape the derivatives industry. *First*, it gave the CFTC "exclusive jurisdiction with respect to . . . agreements . . . involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. § 201(b), 88 Stat. at 1395. This exclusive jurisdiction would "supersede" and "limit the jurisdiction" of "regulatory authorities under the laws of . . . any State." *Id.* *Second*, it "wholly and unequivocally eliminated" the language the Supreme Court had relied on to permit state regulation. Van Wart, *supra*, at 692-93; 1974 Act § 402(d), 88 Stat. at 1413. In this way, Congress made clear that, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned." S. Rep. No. 93-1194, at 35-36 (1974).

Federal and state courts, including the Second Circuit, quickly recognized that the CFTC's exclusive jurisdiction "preempt[ed] the application of state law." *Leist*, 638 F.2d at 322. And they recognized, too, that the Act "preclude[d] antigambling proceedings" and the application of other "state gambling laws" against CFTC-regulated exchanges. *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981).

In 1978, responding to concerns from State officials, Congress expressly delineated the "Jurisdiction of the States," a new section of the CEA permitting States to sue for violations of the CEA. Pub. L. No. 95-405, § 15, 92 Stat. 865, 872 (codified at 7 U.S.C. § 13a-2(1)). But Congress limited that power: States could not sue "a contract market" for CEA violations. *Id.* "Plenary authority to register, regulate, and discipline the contract markets" remained "reserved to the Commission." S. Rep. No. 95-850, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113. And although Congress preserved state authority to enforce "any general civil or criminal antifraud statute of such State," 7 U.S.C. § 13a-2(7), it made no exception for the enforcement of state gambling laws.

Congress reaffirmed this understanding in 1982. That year, Congress amended the Securities Exchange Act of 1934 to preempt state gaming laws. But members of Congress reasoned that a similar amendment to the CEA would be unnecessary. "Similar application of state laws would not apply to futures contracts," because "the CEA gives the CFTC exclusive jurisdiction over futures trading thereby preempting state anti-gaming and bucket shop laws." H.R. Rep. No. 97-626, pt. 1, at 9 (1982) (Conf. Rep.).

### B. Congress Expands The CFTC's Exclusive Jurisdiction To Include Event Contracts.

At the turn of the twenty-first century, Congress experimented with deregulation. "[T]o eliminate uncertainties surrounding application of the [CEA] to several innovative financial

instruments," Congress in the 1990s authorized the CFTC "to exempt specific instruments and transactions from coverage under the CEA." *Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 322 F.3d 1039, 1056 (9th Cir. 2003). The CFTC thus "promulgated regulations exempting eligible swap agreements from CEA coverage." *Id.* Congress also carved out certain event contracts. Pub. L. No. 106-554, § 101(4), 114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)). But even in this deregulatory era, Congress still ensured that federal law preempted application of state law to these swaps. 7 U.S.C. § 16(e)(2).

Then came the 2008 financial crisis. "When that crisis occurred, many saw the previous lack of regulation in swaps as a contributing cause." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Congress responded with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank").

*First*, Dodd-Frank added contract-market-traded swaps to the derivatives within the CFTC's exclusive jurisdiction. *See* Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010). Since then, the CFTC has exercised "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A).

*Second*, Dodd-Frank "defined 'swap' broadly" to include event contracts. *Phillips*, 155 F.4th at 113 (cleaned up); *see also* Derivatives Regulation, *supra*, § 2.06. The definition covers "any agreement" providing for "any" "payment" based "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 2010 Act § 721(a)(21), 124 Stat. at 1666 (codified at 7 U.S.C. § 1a(47)(A)(ii)). Both to account for financial innovation and in recognition of the definition's broad sweep, Dodd-Frank also directed the CFTC "to further define the term[] 'swap,'" 15 U.S.C.

§ 8321(b); *see id.* § 8302(d)(1) (similar). It is using that authority now to confirm and codify that "event contracts" are swaps and that casino gambling transactions, including sports wagers, are not. *See* Event Contract NPRM at 13; Further Definition of "Swap" to Exclude Casino-Style Gambling Products, RIN 3038-AF81, at 9 (Oct. 9, 2026) (to be codified at 17 C.F.R. § 1.3) (Spencer Decl. Ex. 12) ("Interim Final Rule").

*Third*, Dodd-Frank introduced what is known as the "Special Rule." The Special Rule concerns "event contracts" based on certain underlying events, such as "terrorism," "assassination," "war," "gaming," and any "activity that is unlawful under Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). It permits—but does not require—the CFTC to ban the listing of such contracts if the CFTC determines that they "are contrary to the public interest." *Id.*

The event contracts Dodd-Frank placed within the CFTC's exclusive jurisdiction "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25669 (May 7, 2008).

Event contracts are typically binary: One party takes the "yes" position that an event will occur; the other takes the "no" position. Compl. ¶ 28. The contract specifies the value to be paid on the contract, as well as an expiration date. *Id.* When the contract expires, the party whose prediction was correct receives a payout. *Id.* Price tracks expectations: If traders think the outcome increasingly likely, demand for "yes" positions and the price will rise; if the outcome seems less likely, both will drop. Compl. ¶ 30.

Prediction markets, where event contracts are traded, serve several functions. Event contracts can be used to hedge risk and facilitate price discovery while generating real-time

information about future events through market pricing. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35807 (June 12, 2026). Like any other derivative, event contracts may also be used for "speculation." 91 Fed. Reg. at 35808 n.24; *see also Curran*, 456 U.S. at 390 (Congress "intended" "the speculator" "to be protected by the statute as much as the hedger"); *Leist*, 638 F.2d at 288.

Event contracts, including those involving sports, are fundamentally different than sportsbook bets such as those that typically occur in casinos. Interim Final Rule at 14. Event contracts are tradeable: Market participants buy and sell contracts with one another on an exchange, with prices formed through those transactions. *See Raoul*, 2026 WL 2969682, at *1 ("Some users buy contracts they think are undervalued and sell contracts they think are overvalued."). Polymarket US matches those orders; it does not participate in them, take the other side of the trade, or profit based on the outcome. *Id.* ("The market sets the price."). Sportsbook bets, by contrast, are wagers against the sportsbook (the "house"), which sets the odds. And sportsbook wagers are not tradeable; they cannot be transferred to another bettor. The CFTC has treated tradability as a key feature distinguishing swaps from ordinary transactions. Further Definition of "Swap," 77 Fed. Reg. 48208, 48247-48 (2012). And it is one of the key reasons the CFTC has codified that the term "swap" does not encompass "casino-style gambling, including sports wagering." Interim Final Rule at 14 ("[G]ambling products are not inherently tradeable.").

### C. Polymarket US Operates A CFTC-Designated Contract Market.

The CFTC granted Polymarket US its designation as a contract market in July 2025. *See* Spencer Decl. Ex. 1 (CFTC Designation); Lee Decl. ¶ 3. That designation reflects a rigorous federal determination that Polymarket US could and would satisfy all federal requirements governing market integrity, transparency, financial safeguards, and customer protection. After receiving its CFTC designation as a contract market, Polymarket US represented to the CFTC that

"all" its event contracts would fall "within the definition of a 'swap' under the [CEA]." Spencer Decl. Ex. 7 at 2 (No-Action Letter).

Polymarket US specializes in event contracts concerning real-world events that matter to the public. Lee Decl. ¶ 5; Compl. ¶ 57. Starting in September 2025, it certified with the CFTC financial, election, sports, and other event contracts. *See, e.g.,* Spencer Decl. Exs. 2-6 (Self-Certifications); Lee Decl. ¶ 6. The CFTC did not exercise its exclusive authority to stay or prohibit trading in those contracts. *See* 7 U.S.C. § 7a-2(c).

Polymarket US's CFTC designation and contract certifications mark the culmination of a years-long effort to comply with the CEA and CFTC regulations. Lee Decl. ¶ 3. In 2022, the CFTC took the position that event contracts concerning "current events" then offered by Polymarket US's parent company "constitute[d] swaps under the CFTC's jurisdiction." *In re Blockratize, Inc.*, 2022 WL 73864, at *1-2 (CFTC Jan. 3, 2022). The parent company thereafter agreed to offer future event contracts in the United States only through a CFTC-registered market—either a designated contract market or a swap execution facility. *Id.* at *8-9. Polymarket US has identified no State or state regulatory authority that objected to this order.

**D. New York Seeks To Shutter Polymarket US's Federally Regulated Exchange.**

New York seeks to turn back the clock, asserting that the New York Attorney General, not the CFTC, has primary authority over federally regulated contract markets. In February 2026, the Attorney General issued a public alert warning that prediction markets "operate as unregulated gambling." Compl. ¶ 2 & n.1. The State then brought enforcement actions. On April 21, 2026, it sued two CFTC-regulated entities—Coinbase Financial Markets, Inc. and Gemini Titan, LLC—in state court for offering sports event contracts, seeking temporary restraining orders, restitution, disgorgement, and civil and criminal penalties. Compl. ¶ 72.

The CFTC responded. On April 24, 2026, the CFTC sued New York in this District "to

halt [its] efforts to apply and enforce preempted state laws to national markets that are governed by federal law." Compl. ¶ 69. The Commission has since moved for a preliminary injunction barring the State from enforcing those laws against CFTC-designated contract markets. *Id.*; CFTC PI Mot. Undeterred, on July 31, 2026, New York sued a third CFTC-regulated exchange, KalshiEX, again seeking a temporary restraining order and various remedies. Compl. ¶ 72; Verified Pet., *New York v. KalshiEX LLC*, No. 1:26-cv-06550 (S.D.N.Y. July 31, 2026), Dkt. 1-1.

Now, New York has expanded its campaign of enforcement to target Polymarket US. On September 24, 2026, New York filed a petition against Polymarket US in New York Supreme Court under New York Executive Law § 63(12). Pet., *New York v. QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. 1-1. The Petition alleges that by offering federally regulated sports event contracts, Polymarket US engages in unlicensed "gambling" including but not limited to "sports wagering" in violation of the New York Constitution, the Penal Law, the Racing Law, and the federal Wire Act. Pet. ¶ 13; *see* N.Y. Const. art. I, § 9; N.Y. Penal Law §§ 225.05, 225.10, 225.20; N.Y. Rac. Pari-Mut. Wag. and Breed. Law ("Racing Law") §§ 1367(16)(a), 1367-a(2)(a), 1367-a(4)(b); 18 U.S.C. § 1084(a).

The State's demands are sweeping. It seeks an order permanently barring Polymarket US from operating "within ***or from*** New York"—apparently seeking to bar Polymarket US's **nationwide** operations involving "sports, culture, elections, and other events." Pet. Prayer ¶ A (emphasis added). New York further seeks an accounting identifying each of Polymarket US's customers and itemizing every trade and result, $4.6 billion (in restitution, disgorgement, damages, treble penalties on Polymarket US's gains, and penalties of $100,000 for each alleged offer of sports wagering), as well as a temporary restraining order—with no bond—to immediately shut down Polymarket US's federally authorized operations pending a hearing. OSC at 3-5; RJI

Addendum at 2; Lee Decl. ¶ 7. Polymarket US immediately removed the State's action to this District. Notice of Removal, *New York v. QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. 1.

That same day, Polymarket US filed this suit. New York left Polymarket US with no meaningful choice. Enforcement is not merely imminent; it is underway. *See* Lee Decl. ¶¶ 8-9. Polymarket US is thus forced to seek urgent injunctive relief from this Court.

## LEGAL STANDARD

"'A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 223 (2d Cir. 2021) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013)). Because "'the Government is the opposing party,'" the "balance-of-equities and public-interest factors 'merge.'" *Id.* at 224.

## ARGUMENT

### I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions.

The Constitution makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Congress may therefore "preempt state law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), even laws "deep-seated in the police power of the States," *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638 (1973).

There are three kinds of preemption. Congress may preempt expressly, by occupying a field, or through conflict between federal and state law. *Crosby*, 530 U.S. at 372-73. Under each kind of preemption, the CEA preempts state enforcement actions brought under New York law.

**A. The CEA Expressly Preempts State Regulation Of Event Contracts Traded On CFTC-Designated Contract Markets.**

**1. Congress Expressly Preempted State Law When It Gave The CFTC "Exclusive Jurisdiction."**

Express preemption "'focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). No "'particular linguistic formulation'" is required. *Murphy v. NCAA*, 584 U.S. 453, 478 (2018). What matters is that Congress' preemptive intent is "discernible." *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). And where a statute "'contains an express pre-emption'" provision, courts "do not invoke any presumption against pre-emption." *Franklin*, 579 U.S. at 125; *accord Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).

Section 2 is an express-preemption provision. It grants the CFTC "exclusive jurisdiction . . . with respect to . . . agreements, [and] transactions involving swaps . . . , traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Jurisdiction is "the authority of a sovereign power to govern or legislate." *Jurisdiction*, Webster's New Collegiate Dictionary (8th ed. 1974). And where jurisdiction is "exclusive," it "necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992); *see Exclusive*, Webster's New Collegiate Dictionary (8th ed. 1974) ("sole," "single," "excluding others from participation").

The Supreme Court has for decades used "exclusive jurisdiction" as shorthand for preemption. *E.g., N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 89 (1963) ("[W]e hold that the State Commission's orders did invade the exclusive jurisdiction which the Natural Gas Act has conferred upon the Federal Power Commission over the sale and transportation of natural gas in interstate commerce for resale."); *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

Congress chose the exclusive-jurisdiction language deliberately. In *Rice v. Board of Trade*

*of City of Chicago*, the Supreme Court held that the pre-1974 CEA did not preempt state law. *See supra* p.5. Explaining why, the Court compared the CEA's wording to that of the federal Warehouse Act, the statute at issue in *Rice v. Santa Fe Elevator Corp.*, a "companion case[]" decided the same day. *Rice v. Bd. of Trade*, 331 U.S. at 248.

In *Rice v. Santa Fe Elevator Corp.*, the Court held that Congress gave the Warehouse Act preemptive force through two deliberate steps: It (1) eliminated a provision directing that "nothing . . . shall be construed to . . . impair" the "operation of the laws of any State," and (2) added a provision giving the federal government "exclusive" "jurisdiction." 331 U.S. 218, 222-24, 232-33 (1947). Those "amendments" made it "unequivocally . . . clear that [Congress] intend[ed] no regulation except its own." *Id.* at 236. The absence of similar language was dispositive in *Rice v. Board of Trade*: The CEA then lacked "a declaration by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation," so States remained free to supplement the federal scheme. 331 U.S. at 249, 253.

Congress followed the *Santa Fe* preemption roadmap in 1974 when it amended the CEA. *First*, it eliminated the CEA provision preserving a broader role for state regulation. *Compare* Pub. L. No. 74-675, § 4c, 49 Stat. 1491, 1494 (1936) ("Nothing in this section . . . shall be construed to impair any State law applicable to any [exchange-traded] transaction."), *with* Pub. L. No. 93-463, § 402(d), 88 Stat. at 1413 (deleting this language). *Second*, it vested the CFTC with "exclusive jurisdiction" over derivatives traded on a designated contract market. Pub. L. No. 93-463, § 201, 88 Stat. at 1395. Through these two steps, Congress "terminat[ed] the dual system of regulation," subjecting CFTC-regulated transactions "to regulation by one agency and by one agency alone." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 234. By granting "exclusive

jurisdiction" to the CFTC, Congress ousted the States and the application of state law.[1]

Section 2's savings clause confirms as much. It provides that Section 2 does not "supersede" the "jurisdiction" of the "regulatory authorities under the laws of . . . any State," "[*e*]*xcept as hereinabove provided*"—that is, except where Congress granted exclusive jurisdiction to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). As the Ninth Circuit recently explained, "[i]f the exclusive jurisdiction provision was not intended to have preemptive effect, the 'except as hereinabove provided' clause would be superfluous." *KalshiEX LLC v. Assad*, --- F.4th ---, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026). It is not. Instead, "[t]hat prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction." *Flaherty*, 172 F.4th at 231; *accord Leist*, 638 F.2d at 322 ("[T]he courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *Minnesota*, 2026 WL 2150211, at *11.

Congress has left New York with no role to play in regulating Polymarket US's exchange-traded event contracts. Any effort to enforce the State's gambling laws against Polymarket US "invades" the CFTC's "regulatory turf." *Hughes*, 578 U.S. at 163. The CEA expressly preempts such interference.

### 2. The CFTC's Exclusive Jurisdiction Extends To The Determination As To Whether A Certified Contract Is A Swap.

New York cannot enforce its gambling laws by arguing that Polymarket US's certified contracts are not "swaps" under the CEA. That determination is likewise within the exclusive jurisdiction of the CFTC. The CFTC's exclusive jurisdiction is "with respect to" contract market-traded "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). The phrase "with respect to" "'generally has a broadening effect, ensuring that the scope of a provision covers not only its

---

[1] Congress elsewhere expressly delineated the "Jurisdiction of the States," granting state officials authority to enforce the CEA—but *not* "against a contract market." *See, supra*, pp.5-6.

subject but also matters relating to that subject.'" *Mullin v. Doe*, 609 U.S. 324, 339 (2026); *accord Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.). The CFTC's exclusive jurisdiction thus extends beyond swaps to matters relating to swaps—including the threshold determination whether an event contract *is* a swap.

Even before the 1974 Act, the Supreme Court recognized that "Congress ha[d] placed within the jurisdiction of the" CFTC's predecessor agency the authority to answer "questions about the scope, meaning, and significance of" the CEA as applied to particular facts. *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 305-06 (1973); *see also Chi. Mercantile Exch. v. Deaktor*, 414 U.S. 113, 115 (1973). Congress later clarified that the agency's jurisdiction was "exclusive," 7 U.S.C. § 2(a)(1)(A)—and that it extended to the determination of the scope of the term "swap." Congress twice directed the CFTC to "further define the term[] 'swap.'" 15 U.S.C. §§ 8302(d)(1), 8321(b). And it granted the CFTC discretion to determine whether certain swaps should be prohibited as contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Permitting States to decide what counts as a swap in an enforcement action "cannot be reconciled with th[is] decisionmaking scheme," *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011) ("*AEP*"), and "is plainly contrary" to "the Commission's exclusive jurisdiction," *Chi. & N.W. Transp.*, 450 U.S. at 328, 331.[2]

### 3. Polymarket US's Event Contracts Are Swaps.

In any event, Polymarket US's contracts are "swaps" subject to the CFTC's exclusive jurisdiction. That is indisputably true as to most of Polymarket US's contracts, involving "real-

[2] "Federal courts" remain free to "review agency action (or a final rule declining to take action) to ensure compliance with the statute Congress enacted." *AEP*, 564 U.S. at 426; *see, e.g.*, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *5-7 (D.D.C. Sept. 12, 2024). But States may not short-circuit that review via state gambling enforcement actions.

world events of public interest," such as the results of elections or solar storms. *Minnesota*, 2026 WL 2150211, at *6, *14. And it is also true as to sports because, as the Third Circuit concluded, "sports-related event contracts are traded on a CFTC-licensed [designated contract market] and depend on event outcomes associated with economic consequences, they fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction." *Flaherty*, 172 F.4th at 228. The statutory definition does not change simply because the event contracts at issue "happen to be swaps that people find entertaining and fun." *Raoul*, 2026 WL 2969682, at *18.

Event contracts are expressly encompassed within the statutory definitions.

**a.** The term swap includes "any agreement" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The first half covers contracts concerning a broad array of happenings. The ordinary meaning of "event" includes an "outcome," "something that happens" or "a noteworthy happening." *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Similarly, a "contingency" is a "dependence on chance" or "possible or chance event." *Contingency*, Webster's New Dictionary (2009). And "extent"—in "extent of occurrence"—implies a "range" of outcomes. *See Extent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Putting it together, "occurrence" and "nonoccurrence" capture whether an event or contingency happens, and "the extent of the occurrence" sweeps in how an event unfolds. *See Raoul*, 2026 WL 2969682, at *6-7 (demonstrating that any line between a game and its result is "basically semantics").

The second half covers a wide—but not limitless—range of contracts concerning events that are "*associated with potential* financial, economic, or commercial consequence[s]." 7 U.S.C.

§ 1a(47)(A)(ii) (emphasis added); *see Minnesota*, 2026 WL 2150211, at *12. "[A]ssociated with," as the Supreme Court has explained regarding similar language, "sweeps broadly." *Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11-12, 15 (2026) (discussing the term "relating to"); *see Coregis Ins.*, 241 F.3d at 128-29 ("Courts have . . . described the term 'relating to' as equivalent to the phrase[] . . . 'associated with.'"). It covers direct and indirect "connection[s]" so long as they are not "tenuous, remote, or peripheral." *Plaquemines*, 608 U.S. at 12. And a "consequence" is "a result" or "effect." *Consequence*, Webster's New Dictionary (2009). Broader still, Congress required only a "potential"—not actual or probable—"financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

Given all this, Polymarket US's event contracts "fit comfortably within the statutory definition." *Flaherty*, 172 F.4th at 227. The swap definition "reads about as broadly as it could," though it still "limits" swaps to those contracts with at least some degree of potential financial significance or materiality. *Raoul*, 2026 WL 2969682, at *7-8. Consider a contract based on the winner of the NBA Finals, an event associated with financial and economic consequences. Winning causes a surge in the team's valuation, retailers' sales of team merchandise, and the hometown economy. The Knicks took in $278 million in revenue from their 2026 win, with New York restaurants, retailers, and hotels piggybacking off that success.[3]

**b.** The term swap under the CEA also includes "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv).

[3] *See* Spencer Decl. Ex. 9 (Jason Burgos, *NY Knicks Report Reveals MASSIVE Revenue Increase During Legendary Title Run This Spring*, Yahoo! Sports (Aug. 13, 2026), https://sports.yahoo.com/articles/ny-knicks-report-reveals-massive-154449237.html); Spencer Decl. Ex. 8 (Brian Contreras, *Inside the Knicks' Championship Windfall: How NYC Businesses Scored More Than $380 Million*, Inc.com (June 18, 2026), https://www.inc.com/brian-contreras/knicks-championship-nyc-business-revenue/91362704).

This "residual, catch-all" is "intended to cover instruments" that in the view of "those who participate in the derivatives markets" are swaps. Event Contract NPRM at 13. And "event contracts, including those based on sports-, politics-, cultural-, and weather-related events" are "overwhelmingly recognized" by market participants as swaps. Event Contract NPRM at 13, 15.

The actions of market participants speak for themselves. "[B]oth new entrants into the market and longstanding exchanges like CME Group" have "self-certified numerous event contracts based on sports and elections as swaps." Event Contract NPRM at 15. These "Commission registrants have not sought to register at the State level." Event Contract NPRM at 15. And other market participants trade event contracts much as they do other derivatives. "[I]nstitutional traders act as market makers . . . earning revenue by capturing bid-ask spread directly for peer-to-peer trading volume" and "provid[ing] liquidity." Event Contract NPRM at 15-16. And all manner of market participants "have looked to prediction markets to hedge various risks, including those related to sports, weather, and legislative outcomes." Event Contract NPRM at 16.

For good reason, then, the CFTC has consistently recognized that exchange-traded event contracts are swaps. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding 'practice of the government'—like any other interpretive aid—'can inform a court's determination of what the law is.'"); *see* Event Contract NPRM at 13-14. The agency so determined when it required Polymarket US's parent company to offer event contracts only on a CFTC-licensed designated contract market. *Blockratize*, 2022 WL 73864, at *1-2, *8; *see also* Event Contract NPRM at 14. And the CFTC has taken numerous regulatory actions and enforcement proceedings based on that understanding in every administration since Dodd-Frank. Event Contract NPRM at 14.

**c.** The premise of the State's enforcement action is that event contracts constitute "gambling" instead of "swaps." Litigants have been unsuccessfully rolling out variants of this argument for over a century to attack persons offering financial products to others who "endeavor to forecast the future." *Christie Grain & Stock Co.*, 198 U.S. at 247. But "swaps are swaps whether they are used to gamble." *Raoul*, 2026 WL 2969682, at *10. Besides, Polymarket US's contracts are different in kind from wagering, such as at a sportsbook. *See supra* p.9. There is no "house" setting the odds and serving as the counterparty, and contracts are freely tradeable on Polymarket US's market. *Id.* These fundamental differences are why the CFTC issued an interim final rule codifying that "casino-style gambling, including sports wagering" are *not* swaps. Interim Final Rule at 9. Congress has also confirmed that trading on a designated contract market is not wagering. With the rise of online gambling, Congress passed the Unlawful Internet Gambling Enforcement Act of 2006. In that Act, Congress defined a "bet or wager," but it specifically excluded from the definition "any transaction conducted on or subject to the rules of" a designated contract market "under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii). And with Dodd-Frank just a few years later, Congress underscored that the CFTC *alone* has oversight over event contracts, including in the agency's determination that an event contract is contrary to the public interest under the Special Rule because it involves gaming. *See*, *supra*, p.7.

#### 4. Contrary Decisions Are Irreconcilable With The Statute And With Each Other.

*KalshiEX LLC v. Williams* and other courts have allowed the application of state gambling laws. Those decisions share a bottom line but little else. They cannot be reconciled with controlling law, each other, or, more importantly, the text of the CEA.

Start with *Williams*, in which another court in this District declined to treat Section 2(a)(1)(A) as an express preemption provision. *Williams* reasoned that the preemptive reach of

the CFTC's "exclusive jurisdiction" could be determined only through implied-preemption principles and a presumption against preemption. 2026 WL 2017466, at *6 (S.D.N.Y. July 13, 2026). That approach cannot be squared with *Leist*, which explained that Section 2(a)(1) "preempts the application of state law." 638 F.2d at 322. This Court should follow *Leist*, and *Williams* did not cite much less distinguish it. And a court may not apply a presumption against preemption to an express preemption clause. *Franklin*, 579 U.S. at 125. Each of the courts of appeals to reach the question has rejected *Williams*' reasoning: The Ninth Circuit held that the "plain wording" of Section 2 makes it an express preemption clause, *Assad*, 2026 WL 2543846, at *7; the Third Circuit, too, applied the "clear text" of Section 2, *Flaherty*, 172 F.4th at 231; and even the Sixth Circuit agreed that Section 2 expressly preempts state law governing the "licensing and operation" of a contract market, *KalshiEX LLC v. Schuler*, --- F.4th ---, 2026 WL 2884087, at *21 (6th Cir. Sept. 25, 2026). *Williams* is now before the Second Circuit, where the United States has urged that it be reversed. CFTC 2d Cir. Amicus Br. at 10, 29. This Court should not extend it.

Other courts departing from the plain meaning of the CEA are divided on the meaning of "swap." The Ninth Circuit concluded that sports-event contracts are not "swaps" because, it reasoned, the "outcome" of a sports game is not the "occurrence . . . of an event." *Assad*, 2026 WL 2543846, at *5, *9-11. The Sixth Circuit discarded much of that reasoning as inconsistent with the statute (it is). *Schuler*, 2026 WL 2884087, at *9. But it concluded that sports event contracts are not swaps anyway because, in its view, a swap must be "*intrinsically* associated with a financial consequence." *Id.* at *11. That "intrinsic" qualifier appears nowhere in the text of the CEA. Regardless, these cases offer no support for the State's position here as both the Ninth and Sixth Circuits narrowly scoped their holdings to just *sports-related* event contracts. But the State

seeks to shut down trading of *all* event contract trading on Polymarket US.

Each of the decisions above recognized that the interpretation Polymarket US advances here is within the meaning of the text of the CEA. Yet each refused to follow where the text leads. For example, the *Williams* court found it "clear that Congress intended the CEA to preempt certain areas of derivative trading," but it relied on what could be "implied" to narrow the preemptive scope. 2026 WL 2017466, at *6. The Ninth Circuit discussed how the plain language of "swap" would cover sports event contracts—it was a "reasonable interpretation[]"—but nonetheless the court relied on its own "common sense" and "context" to narrow the definition. *Assad*, 2026 WL 2543846, at *9-10. The Sixth Circuit similarly found that the "ordinary meaning" of an event contract "associated with" financial consequences could be "broad" and include sports-event contracts, yet the court held that they were not swaps because of context, feared consequences of that reading, and the CEA's "core purpose." *Schuler*, 2026 WL 2884087, at *10-14. Indeed, the Sixth Circuit effectively added the word "intrinsically" to the statute to reach its result. *Id.* at *10.

The better course is the one charted by the Supreme Court. When there is an express preemption clause, the "plain text . . . begins and ends" the analysis. *Franklin*, 579 U.S. at 125. To do otherwise leads to judicial policymaking with potentially extraordinary consequences. Consider *Schuler*: Because the Sixth Circuit held that Section 2's grant of "exclusive jurisdiction" does not preempt state gambling laws, 2026 WL 2884087, at *22, *all* derivatives trading regulated by the CFTC on *every* registered exchange in the United States would be subject to the gambling regimes of 50 states. That is an untenable result—at war with the long history of uniform federal regulation, the federal government's "vital[] concern[]" with these markets, *Leist*, 638 F.2d at 322, and the plain text of the CEA.

### B. The CEA's Comprehensive Scheme Bars New York From Regulating The Field Of Event Contracts.

Field preemption occurs when "federal legislation is 'sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation.'" *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987). Field preemption looks at "the scope, structure, and purpose of the federal law" for "implied manifestations of congressional intent" to preempt state law. *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). Here, scope, structure, and purpose all point one way: Congress intended to regulate the narrow field of trading on CFTC-designated contract markets.

Start with scope. Through "the 1974 Amendments to the [CEA]," Congress "set up a comprehensive scheme for regulation of trading in commodity futures." *British Am.*, 560 F.2d at 138. The CEA details (1) stringent requirements to become and remain a designated contract market, 7 U.S.C. §§ 7(d), 8(a); (2) the process for listing and approving contracts, *id.* § 7a-2(c); (3) the kinds of contracts that may be listed, *id.* § 7a-2(c)(5); and (4) the enforcement mechanisms for contract-market or trader misconduct, *e.g., id.* §§ 7b, 8(b), 9, 13a, 13b. All told, "[t]he federal statutory directives provide a full set of standards"—"a 'single integrated and all-embracing system'"—governing contract-market trading. *Arizona v. United States*, 567 U.S. 387, 400 (2012).

The statutory structure confirms that Congress "ma[de] a single sovereign responsible for" regulating contract-market transactions. *Arizona*, 567 U.S. at 401. The CFTC has "exclusive jurisdiction" "with respect to" contract market-traded "future[s]," "option[s]" on futures, and "swaps"—that is, over all "agreements" that may be "traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). It is responsible for "further defin[ing] the term[] 'swap.'" 15 U.S.C. §§ 8302(d)(1), 8321(b). And the Special Rule leaves it to the CFTC, not the States, to determine whether an event contract involves "gaming," is "contrary to the public interest," and should be

prohibited. 7 U.S.C. § 7a-2(c)(5)(C).

The States, by contrast, may enforce the CEA against "any person"—but *not* against "a contract market," 7 U.S.C. § 13a-2(1), an indication that Congress was concerned with "'detracting from the integrated scheme of regulation,'" *Arizona*, 567 U.S. at 402 (cleaned up). State authority against contract markets is limited to enforcing the "antifraud provisions" of the CEA and CFTC regulations—and then only after "prior written notice" to the CFTC. 7 U.S.C. § 13a-2(8)(A), (B). And the CEA preserves the application of state law only as to commodities transactions "not conducted on or subject to the rules" of contract markets. *Id.* § 16(e)(1)(B)(i) (emphasis added).

Statutory purpose beats the same drum. The post-1974 CEA keeps regulation of "market participants" "under the oversight of the Commission," 7 U.S.C. § 5(b), so that "there would be no interference by other government agencies in the area committed to the plenary control of the CFTC," *Navigator Grp. Funds v. Shearson Hayden Stone Inc.*, 487 F. Supp. 416, 420 n.5 (S.D.N.Y. 1980).

Every indicator of congressional intent shows that Congress "intend[ed] federal law to 'occupy the field'" of trading on designated contract markets. *Crosby*, 530 U.S. at 372. This District said as much more than forty years ago. *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982) (CEA "has preempted the field insofar as futures regulation is concerned"). New York "may not enter" that field "in any respect," *Arizona*, 567 U.S. at 402, or use its gaming laws to regulate Polymarket US's contract market "direct[ly]" or "indirectly," *N. Nat. Gas Co.*, 372 U.S. at 91.

### C. New York's Attempt To Regulate Contracts Listed On Polymarket US's Contract Market Conflicts With Federal Law.

Conflict preemption applies where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" or where compliance with both

state and federal law is "impossible." *Crosby*, 530 U.S. at 373. Even when "both federal and state law" share the same "ultimate goal," state law "is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." *Ouellette*, 479 U.S. at 494.

New York's use of its gambling statutes to regulate or shut down Polymarket US would conflict with the central objective of the CEA: uniform federal regulation of derivatives markets. At a minimum, New York's attempt to enforce its laws would subject national, federally regulated exchanges to "different substantive standards" in different States—an outcome fundamentally at odds with the uniformity Congress sought to achieve. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990). After all, to permit New York to regulate likewise means allowing every other State to do the same. The consequence would be the "total chaos" the CFTC's exclusive jurisdiction was designed to avoid. *See supra* p.5.

New York's demanded relief illustrates and further heightens this conflict. Because Polymarket US largely operates its exchange from New York, the State's demand for an order barring it from operating "within or from New York," Pet. Prayer ¶ A; OSC ¶ 1(a), is not a demand that Polymarket US obey New York law in New York alone. Rather, it is essentially a demand that one State be permitted to extinguish a federally designated market everywhere. Congress gave the CFTC "exclusive jurisdiction" precisely to prevent States from having such a veto. 7 U.S.C. § 2(a)(1)(A); *Leist*, 638 F.2d at 321-22. The CFTC agrees, arguing "New York lacks jurisdiction to regulate swap transactions on a [designated contract market]—let alone ban them nationwide." CFTC 2d Cir. Amicus Br. at 10, 29.

New York's enforcement of its gaming laws would also conflict with the means Congress chose to regulate event contracts. Congress permits designated contract markets to self-certify contracts that comply with federal law, subject to "public interest" review *only* by the CFTC.

*KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024); 7 U.S.C. § 7a-2(c)(5)(C). As an earlier decision in this District explained, "trading on or the operation of a [contract] market" is a "matter[] for uniform federal regulation," not "for review or adjudication by individual state courts." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *4-5 (S.D.N.Y. Oct. 17, 2002).

Finally, the CFTC has concluded it would be impossible for contract markets to comply with both federal and state law. Federal law requires each contract market to "provide its members . . . with impartial access to its markets and services" "in a non-discriminatory manner." 17 C.F.R. § 38.151(b). According to the CFTC, a contract market violates this "impartial-access requirement" if it limits members' access based on "geograph[y]"—including based on compliance with "state gambling laws." Br. for the CFTC as Amicus Curiae at 24, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31. New York demands both that and more. At its narrowest, New York requires that Polymarket US wall off New York members unless and until it complies with New York's licensing scheme. Pet. Prayer ¶ A. It further seeks to bar Polymarket US from operating "from New York"—which implicates market access and design far beyond New York's boundaries. On both fronts, compliance with both federal law and New York's demands is impossible: Polymarket US cannot comply with the CFTC's demands for impartial access and New York's demands to wall off its consumers, and it cannot operate its market while forbidden from operating from its home State.

## II. Polymarket US Will Be Irreparably Harmed Without Immediate Relief.

Without an injunction, "irreparable injury" is unavoidable. *Morales*, 504 U.S. at 382. The State seeks to shut down Polymarket US's operations and subject Polymarket US to $4.6 billion in liability. Polymarket US thus faces an impossible choice: "continually violate [New York] law and expose [itself] to potentially huge liability" or surrender its business "during the pendency of

the proceedings and any further review." *Id.* at 381. Either course inflicts harm that cannot be fully remedied later. Sovereign immunity bars any monetary recovery from the State. *Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020). And the enforcement action itself—even a meritless one—threatens "loss of reputation, good will, and business opportunities," which are likewise irreparable. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

New York seeks to bar *all* of Polymarket US's operations throughout the United States. *See* Lee Decl. ¶¶ 8-10. That termination would harm Polymarket US's reputation, growth, and market position across the country. And the resulting loss of customers, clients, and partners would lead to incalculable damages. *Register.com*, 356 F.3d at 404; *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).

Even if compliance would force Polymarket US to cut off just New York residents from event contracts available elsewhere, that would damage customer goodwill and reduce liquidity on its nationwide platform. *See* Lee Decl. ¶¶ 11-13. Such a "[m]ajor disruption" to Polymarket US "can be as harmful as termination" and similarly irreparable. *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993). For example, the reduced liquidity caused by walling off New York residents would degrade the price discovery that gives the market much of its value. Lee Decl. ¶ 12.

## III. The Balance Of Equities And Public Interest Strongly Support Preliminary Relief.

The public has a strong interest in the correct application of federal law, including the nonapplication of state statutes preempted by federal law. Simply put, "the public interest lies with the enforcement of the Constitution." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013). By contrast, New York has no interest in unconstitutional enforcement of a state

law. *Amarin Pharma, Inc. v. U.S. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015). Congress assigned exclusive regulation of event contracts traded on designated contract markets to the CFTC, and New York has no valid interest in overriding that judgment. *See Minnesota*, 2026 WL 2150211, at *17.

## CONCLUSION

The Court should grant a preliminary injunction enjoining Defendants from enforcing New York's civil and criminal gaming, gambling, and wagering laws—including N.Y. Const. art. I, § 9; N.Y. Penal Law §§ 225.05, 225.10, 225.20; and Racing Law §§ 1367(16)(a), 1367-a(2)(a), 1367-a(4)(b)—or New York Executive Law § 63(12) or any other state law or regulation to the extent it purports to regulate or prohibit Polymarket US's activities governed exclusively by or otherwise conflicts with the CEA and the CFTC's implementing regulations. *See* Compl. Prayer ¶ B; Compl. ¶ 8; Pet. ¶ 13.

October 12, 2026

Respectfully submitted,

By: /s/ *Orin Snyder*

GIBSON, DUNN & CRUTCHER LLP

Orin Snyder
Matt Benjamin
Rachel Jackson (application pending)
Amanda LeSavage
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Pro hac vice applications pending*

*Attorneys for Plaintiff QCX LLC d/b/a Polymarket US*

**WORD COUNT CERTIFICATION**

I, Orin Snyder, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1(c) because it contains 8,716 words, excluding the parts of the memorandum of law exempted from the word limit by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
October 12, 2026

*<u>/s/ Orin Snyder</u>*
Orin Snyder