**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| QCX LLC d/b/a Polymarket US,<br><br>*Plaintiff*,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as Attorney General of New York; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission,<br><br>*Defendants*. | Hon. Ronnie Abrams<br>Case No. 1:26-cv-08345 (RA)<br>[rel. 1:26-cv-08338 (RA)]<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF QCX LLC'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1
ARGUMENT ....................................................................................................3
I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions. ....................................................3
A. The CEA Expressly Preempts Defendants' Efforts To Apply State Gambling Laws Against Polymarket US. ....................................................3
B. The CFTC's Exclusive Jurisdiction Includes Determining Whether A Certified Contract Is A Swap. ....................................................7
C. Event Contracts Traded On Polymarket US Are Swaps. ....................................................8
D. The CEA's Comprehensive Scheme Bars Defendants From Regulating The Field Of Event Contracts. ....................................................14
E. New York's Laws Are Conflict Preempted. ....................................................15
II. Polymarket US Will Suffer Irreparable Harm Absent An Injunction. ....................................................16
III. The Equities And Public Interest Favor An Injunction. ....................................................18
IV. This Court May Grant Injunctive Relief. ....................................................18
V. No Bond Is Warranted. ....................................................19
CONCLUSION ....................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....................16

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)....................8

*Amarin Pharma, Inc. v. U.S. FDA*,
119 F. Supp. 3d 196 (S.D.N.Y. 2015)....................18

*AT&T Co. v. Cent. Office Tel., Inc.*,
524 U.S. 214 (1998)....................7

*Chevron USA Inc. v. Plaquemines Par.*,
608 U.S. 1 (2026)....................9

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ....................6

*City of Brunswick v. Honeywell Int'l, Inc.*,
184 F.4th 1230 (11th Cir. 2026) ....................19

*City of Martinsville v. Express Scripts, Inc.*,
128 F.4th 265 (4th Cir. 2025) ....................19

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) ....................12

*Coinbase Fin. Mkts., Inc. v. Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026)....................8, 9, 10, 13, 16

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
241 F.3d 123 (2d Cir. 2001)....................9

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) ....................17

*DeCanas v. Bica*,
424 U.S. 351 (1976)....................14

*Dep't of Agric. Rural Dev. Rural Hous. v. Kirtz*,
601 U.S. 42 (2024)....................4

*Doctor's Assocs., Inc. v. Distajo*,
107 F.3d 126 (2d Cir. 1997)....................19

*Drake v. Lab'y Corp. of Am. Holdings*,
290 F. Supp. 2d 352 (E.D.N.Y. 2003) ....................8

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)....................................................................5

*Horowitz v. 148 S. Emerson Assocs. LLC*,
888 F.3d 13 (2d Cir. 2018)....................................................................18

*KalshiEX LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) ....................................................................2, 3, 6

*KalshiEX LLC v. Williams*,
No. 26-1835 (Nov. 3, 2026)....................................................................2

*KalshiEX LLC v. Schuler*,
192 F.4th 664 (6th Cir. 2026) ....................................................................10

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)....................................................................1, 4

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................................................................13

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)....................................................................1

*Ludlow Exch., LLC v. James*,
2026 WL 3408217 (S.D.N.Y. Nov. 10, 2026)....................................................................2, 13

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010)....................................................................3

*Mississippi v. Louisiana*,
506 U.S. 73 (1992)....................................................................3

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................................................................17

*Mullin v. Doe*,
609 U.S. 324 (2026)....................................................................7

*Murphy v. NCAA*,
584 U.S. 453 (2018)....................................................................4

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
992 F.2d 430 (2d Cir. 1993)....................................................................17

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015)....................................................................15

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)....................................................................14, 15

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981)....................................................................5

*Par. of Cameron v. Devon Energy Prod. Co., L.P.*,
193 F.4th 753 (5th Cir. 2026) ....................19

*Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*,
795 F.2d 415 (5th Cir. 1986) (en banc) ....................4, 6, 16

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) ....................1, 4

*Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)....................18

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)....................3, 5, 6

*Romag Fasteners, Inc. v. Fossil, Inc.*,
590 U.S. 212 (2020)....................9

*Suffolk County v. Long Island Lighting Co.*,
728 F.2d 52 (2d Cir. 1984)....................14

*U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993)....................4

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) ....................2, 9, 10

*Yousefzadeh v. Johnson & Johnson Consumer Inc.*,
184 F.4th 130 (2d Cir. 2026) ....................6

**STATUTES**

7 U.S.C. § 1a(47) ....................8, 9, 10, 11

7 U.S.C. § 2(a) ....................1, 3, 4, 6, 7

7 U.S.C. § 5(a) ....................12

7 U.S.C. § 7(d) ....................18

7 U.S.C. § 7a-2(c) ....................6, 14, 15, 18

7 U.S.C. § 9....................18

7 U.S.C. § 13a....................18

7 U.S.C. § 13a-2....................5, 14, 15

7 U.S.C. § 13b....................18

7 U.S.C. § 16(e) ....................4

7 U.S.C. § 27d(a) ....................4

7 U.S.C. § 27f(b) .......... 4

15 U.S.C. § 8302(d) .......... 13

15 U.S.C. § 8321(b) .......... 13

28 U.S.C. § 1447(d) .......... 19

N.Y. Penal Law § 225.00 .......... 1

**REGULATIONS**

17 C.F.R. pt. 38 .......... 18

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) .......... 11

*DCM Impartial Access Requirements*, 91 Fed. Reg. 72407 (Nov. 10, 2026) .......... 16

*Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969 (Oct. 19, 2026) .......... 13

*Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66022 (Oct. 19, 2026) .......... 11, 12

**OTHER AUTHORITIES**

156 Cong. Rec. S5902 (daily ed. July 15, 2010) .......... 5

*In re Blockratize, Inc.*, 2022 WL 73864 (CFTC Jan. 3, 2022) .......... 12

Br. for CFTC as Amicus Curiae, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, No. 80-203, 1981 WL 390245 (U.S. Sept. 10, 1981) .......... 5

CFTC Staff Letter No. 93-66 (June 18, 1993) .......... 11

*Commodity Investment Fraud: Hearings Before the Permanent Subcomm. on Investigations of S. Comm. on Governmental Affs.*, 97th Cong. (1982) .......... 5

H.R. Rep. No. 97-626, pt. 1 (1982) .......... 4

A. Imwalle, *Republicans face wake-up call after Valley losses*, WKBN.com (Nov. 4, 2026) .......... 10

S. Rep. No. 1131, 93d Cong., 2d Sess. (1974) .......... 4

## PRELIMINARY STATEMENT

This case implicates issues going to the heart of the national economy. Defendants assert unbounded power to classify any derivative as illegal gambling and to shut down any federally regulated exchange operating "within or from New York." Pet., Prayer ¶¶ A-K, *James v. QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. 1-1 ("Pet."). Defendants' overreach defies common sense and Congress's decision, through the Commodity Exchange Act ("CEA"), to give the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over contract-market-traded derivatives. 7 U.S.C. § 2(a)(1)(A). Many of the cases on which Defendants rely reject such unbounded power; none endorses it.

Defendants' theory has no limit. Under New York law, "a person engages in [illegal] gambling when he . . . risks something of value upon the outcome of a . . . future contingent event not under his control or influence." N.Y. Penal Law § 225.00. That prohibition sweeps in most every derivative, not just sports-related event contracts, and not just swaps. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 165 (2d Cir. 2015) ("In general, derivatives are purely financial contracts that call for payment . . . based on a specific event."). On Defendants' theory, nothing stands between New York and the trillion-dollar derivatives industry.

Yet "courts have held" for *decades* "that [§] 2(a)(1) of the CEA preempts the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), including "commercial gambling" laws, as to transactions within the CFTC's jurisdiction, *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979). Defendants have few answers. They invoke federal statutes expressly stating that contract-market-traded contracts are *not* wagers. Mem.20; Opp.4 n.3. They add language to the CEA they admit is not there. Opp.15 n.10. And

they repeatedly reach for a presumption against preemption that does not apply to the CEA's unambiguous text.

Defendants' cases do not help them. The cases are irreconcilable with one another and with federal law—and did not address the sweeping authority Defendants assert here or Polymarket US's distinct arguments. *Ludlow Exch., LLC v. James*, for example, denied an injunction because "New York does not purport to hold the power to prohibit any operation of a [contract market] within its borders." 2026 WL 3408217, at *14 (S.D.N.Y. Nov. 10, 2026). Here, Defendants *would* bar Polymarket US from operating "within or from New York" unless "licensed by the New York State Gaming Commission." Pet., Prayer ¶ A. The Second Circuit's recent denial of an injunction pending appeal offered no reasoning at all. *See* Order, *KalshiEX LLC v. Williams*, No. 26-1835 (Nov. 3, 2026). And most of Defendants' favored cases address only sports contracts, *see KalshiEX LLC v. Assad*, 190 F.4th 1098, 1110 (9th Cir. 2026), whereas Defendants seek to enforce against *all* types of "contracts relating to sports, culture, elections, and other events," Pet., Prayer ¶ A. In the most analogous case, the District of Minnesota granted a preliminary injunction to prevent a similarly broad assertion of state authority. *United States v. Minnesota*, 2026 WL 2150211 (D. Minn. July 27, 2026).

Preliminary relief is necessary here, too. Continued trading threatens mounting exposure to penalties, while curtailing trading would irreparably disrupt customer relationships and impair the liquidity and price discovery upon which market participants rely. Polymarket US's eventual vindication on the merits cannot undo these injuries. Meanwhile, Defendants suffer no injury. They may still regulate sportsbooks. But they have no legitimate interest in enforcing preempted laws against a CFTC-designated contract market. The Court should issue a preliminary injunction.

# ARGUMENT

## I. Polymarket US Is Likely To Succeed On The Merits Because The CEA Preempts State Enforcement Actions.

Even under Defendants' supposedly heightened standard, *see* Opp.11, Polymarket US need only show "a likelihood of success." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). It has done so.

### A. The CEA Expressly Preempts Defendants' Efforts To Apply State Gambling Laws Against Polymarket US.

Express preemption turns on statutory text. And the CEA's text directs that the CFTC has "exclusive jurisdiction" "with respect to" "swaps . . . traded or executed on a contract market" like Polymarket US. 7 U.S.C. § 2(a)(1)(A). Where jurisdiction is "exclusive," it "necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992). Congress selected the phrase "exclusive jurisdiction" after the Supreme Court interpreted materially identical statutory language as "unequivocally . . . clear that [Congress] intend[ed] no regulation except its own." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947). Moreover, § 2's savings clause confirms its preemptive effect. "If the exclusive jurisdiction provision was not intended to have preemptive effect, the 'except as hereinabove provided' clause would be superfluous." *Assad*, 190 F.4th at 1110; *see* Mem.13-15.

#### 1. Section 2's Grant Of "Exclusive Jurisdiction" Preempts State Law.

Defendants' argument that the "exclusive jurisdiction" clause has no preemptive effect is wrong and has been widely rejected.

*First*, § 2 does not allocate authority merely among federal regulators. Opp.22-23. It treats "regulatory authorities under the laws of the United States *or of any State*" alike: Both retain jurisdiction "except as hereinabove provided" in the "exclusive jurisdiction" clause. 7 U.S.C. § 2(a)(1)(A) (emphasis added). This language was added "to ensure that 'the CFTC's exclusive

jurisdiction . . . supersedes state as well as federal agencies.'" *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 421 (5th Cir. 1986) (en banc) (alteration adopted) (quoting S. Rep. No. 1131, 93d Cong., 2d Sess. 6 (1974)). Thus, courts were quick to "h[o]ld that § 2(a)(1) of the CEA preempts the application of state law," *Leist*, 638 F.2d at 322, including "commercial gambling" laws, as to transactions within the CFTC's jurisdiction, *Rasmussen*, 608 F.2d at 178.[1]

*Second*, the CEA's other express-preemption provisions, enacted years or decades later "in a different set of amendments," do not make § 2 "any less clear." *Dep't of Agric. Rural Dev. Rural Hous. v. Kirtz*, 601 U.S. 42, 63-64 (2024). *Contra* Opp.6, 23. One provision name checks "insurance" to satisfy the McCarran-Ferguson Act's special "clear-statement rule" for "pre-emption" of state insurance law. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993). Outside that context, Congress need not "employ a particular linguistic formulation when preempting state law." *Murphy v. NCAA*, 584 U.S. 453, 478 (2018). Another provision ensures States may not regulate "hybrid instrument[s]," 7 U.S.C. § 27f(b), which the CFTC "shall not regulate," *id.* § 27d(a). The same is true of § 16(e)(2), which preempts state gambling laws as to specified transactions "excluded" or "exempted" from the CFTC's jurisdiction. *Id.* § 16(e)(2). When Congress added a similar provision to the Securities Exchange Act in 1982, it chose not to amend the CEA as to transactions within the CFTC's purview because "the CEA gives the CFTC exclusive jurisdiction," already "preempting state anti-gaming . . . laws." H.R. Rep. No. 97-626, pt. 1, at 9 (1982). Defendants dispute none of this yet assert, incorrectly, that there would be surplusage if § 2 were a preemption provision. Opp.23.

---

[1] *Leist*'s discussion of preemption was not dicta, *contra* Opp.23, but an essential part of its reasoning as to whether the CEA permitted private causes of action. *See* 638 F.2d at 322.

Section 13a-2(7) confirms that States lack "jurisdiction" to apply their gambling laws to transactions on designated contract markets. That section restored state authority to enforce "general antifraud statute[s]." Mem.6. By "incorporating specific aspects of state law," Congress confirmed that remaining state law was "pre-empted." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982). So, the CEA's "specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings." *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981). Again, Defendants have no answer. *See* Opp.26 (addressing a *different* subsection of § 13a-2).

*Third*, Defendants object that *Rice*'s interpretation of "exclusive jurisdiction" was based on the statute's "special and peculiar [legislative] history." Opp.23 (quoting *Rice*, 331 U.S. at 232). But the CEA's statutory history teaches the same lessons. When it created the CFTC, Congress eliminated a broad savings clause and vested an agency with "exclusive jurisdiction," just as the Supreme Court instructed in *Rice*. Mem.14-15. As the CFTC explained to the U.S. Supreme Court in 1981, "Congress was obviously aware of the decision in *Rice*" when it amended the CEA. Br. for CFTC as Amicus Curiae, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, No. 80-203, 1981 WL 390245, at *11 (U.S. Sept. 10, 1981). The next year, New York's Assistant Attorney General joined a statement urging "Congress to reconsider its 1974 decision to grant exclusive jurisdiction to the CFTC and return jurisdiction to the states." *Commodity Investment Fraud: Hearings Before the Permanent Subcomm. on Investigations of S. Comm. on Governmental Affs.*, 97th Cong. 196, 197 (1982).

*Fourth*, to the extent relevant, Dodd-Frank's "limited legislative history," Opp.23-24, *undermines* Defendants' position. It shows that members were aware markets might "construct an 'event contract' around sporting events." 156 Cong. Rec. S5902, S5906 (daily ed. July 15,

2010). In response, Congress gave *the CFTC*, not States, discretion to ban the listing of contracts involving "gaming" if the CFTC determines that they would be "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i); *see* Mem.8. Permitting States to reach a different "public interest" determination "would frustrate the intent of Congress" for the "agency to exercise the requisite judgment and to provide the needed uniformity." *Point Landing*, 795 F.2d at 422.

*Finally*, the presumption against preemption, Opp.22, cannot alter the meaning of "exclusive jurisdiction," which "plainly and unambiguously" preempts state law, Opp.23 (citing *Assad*, 190 F.4th at 1110). If the presumption applies at all in express-preemption cases, *see* Mem.13, it is only where "a pre-emption clause is susceptible of more than one plausible reading," *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, 184 F.4th 130, 145 (2d Cir. 2026), and Defendants offer none. Regardless, when it comes to Defendants' efforts to treat Polymarket US's *interstate* operations as illegal gambling, the presumption is of no assistance because "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025). And *Rice* held that the presumption was overcome where Congress took the exact same steps it later took in amending the CEA. *See* 331 U.S. at 230.

**2. Defendants' Enforcement Action Falls Within The Scope Of The CFTC's Exclusive Jurisdiction.**

As a fallback, Defendants argue the "exclusive jurisdiction" provision preempts only those laws "directly regulating the licensing and operation of [contract markets]." Opp.24. That is incorrect. The CFTC's "exclusive jurisdiction" "with respect to" contract-market-traded "transactions" is unqualified. 7 U.S.C. § 2(a)(1)(A). That is why Congress saw no need to append to § 2 a provision "preempting state anti-gaming . . . laws." Mem.6. Section 2's "savings clause[]," Opp.24, only confirms the section's broad preemptive force, *supra* p.3. And using state

"gambling" laws to shut down an exchange can hardly be called "incidental," Opp.24, particularly given that the CEA was amended against the backdrop of state attempts to use those laws to regulate derivatives. Mem.4-6.

Defendants' argument is also irrelevant because Defendants are using state law for the precise purpose they say is impermissible. Defendants seek to condition Polymarket US's continued operation and listing of contracts on obtaining a state gambling license. Pet., Prayer ¶ A. Defendants thus seek to mandate the "licensing" and control the "operation" of a contract market. Opp.24. The contrary conclusion (that state gambling law inexplicably falls outside the CEA's preemptive scope) would give States limitless authority to regulate all derivatives, destroying the national system of exchange trading the CEA was created (and amended) to foster. Mem.5-6. "[T]he act cannot be held to destroy itself." *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998).

**B. The CFTC's Exclusive Jurisdiction Includes Determining Whether A Certified Contract Is A Swap.**

The grant of "exclusive jurisdiction" "with respect to" contract-market-traded "transactions involving swaps," 7 U.S.C. § 2(a)(1)(A), "covers not only" swaps "but also matters relating to th[e] subject," including the threshold determination whether an event contract is a swap. *Mullin v. Doe*, 609 U.S. 324, 339 (2026). If a State could bring civil or criminal charges every time it disagrees with the CFTC's determination, trading would grind to a halt and the CFTC's exclusive jurisdiction would become meaningless. Mem.15-16.

Defendants' barebones response fails. Polymarket US *is* asking the Court "to say what the law is," Opp.13, specifically the phrase "with respect to," about which Defendants and the cases they cite say nothing. Polymarket US is *not* asking the Court to "assume Plaintiff's definition of swap [is] true." Opp.12. It is asking the Court to hold that permitting States to decide what counts

as a swap through gambling-enforcement proceedings for $4.6 billion "cannot be reconciled with the decisionmaking scheme" Congress established, where Defendants may raise any disagreements with the CFTC through the ordinary administrative-review process. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011).

Despite Defendants' suggestion otherwise, there are and have been multiple avenues for them to challenge the CFTC's actions "with respect to" swaps. *See* Opp.12. They could, for example, challenge the CFTC's recent interim final rule instead of asking the Court to simply ignore it. Opp.20; *see Drake v. Lab'y Corp. of Am. Holdings*, 290 F. Supp. 2d 352, 368 n.16 (E.D.N.Y. 2003) ("Interim-final rules . . . have the force of law, pending enactment of the final rule."). What Defendants cannot do is usurp the CFTC's exclusive jurisdiction "with respect to" swaps through gambling-enforcement proceedings.

### C. Event Contracts Traded On Polymarket US Are Swaps.

#### 1. Event Contracts Are Swaps Under Subsection (ii).

Defendants argue that event contracts are not "swaps" under § 1a(47)(A)(ii) because the CEA is not concerned with "various outcomes" of an event. Opp.14. But the text of (A)(ii) refers to "the occurrence, nonoccurrence, or *the extent of the occurrence* of an event or contingency." "If 'occurrence' and 'nonoccurrence' capture whether an event happens, 'the extent of the occurrence' extends to how an event *resolves*." *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *6 (N.D. Ill. Oct. 2, 2026) (emphasis added). Defendants would read "extent of the occurrence" out of the statute.

Defendants contend that Polymarket US's event contracts are not "*associated with* a potential financial, economic, or commercial consequence." Opp.14. To Defendants, event contracts are limited to those with "direct or inherent economic consequences." Opp.15. But

Defendants *concede* this limit is not found "in the text." Opp.15 n.10. Courts may not "read into statutes words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020).

Nor would the text's ordinary meaning cover "infinity." Opp.15 n.10. "[A]ssociated with," 7 U.S.C. § 1a(47)(A)(ii), is language that "sweeps broadly," covering both direct and "indirect" "connection[s]," *Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11 (2026). But it does not cover connections that are "tenuous, remote, or peripheral." *Id.* at 12; *see* Mem.18. Defendants' only response is that reading "associated with" as synonymous with "related to" requires an "unfounded textual substitution." Opp.16. But they have no response to the Second Circuit's description of the terms as "equivalent," "broad," and "unambiguous." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001).

Defendants argue that cases applying the text as written are "unpersuasive" because they do not "explain[] why" certain event contracts have a sufficient connection to meet "congressional intent." Opp.17. They do. *Minnesota* explained, for example, that "a prediction market contract that pays out based on who wins an upcoming election for a seat in the United States Senate is closely associated with potential financial, economic, or commercial consequences." *Minnesota*, 2026 WL 2150211, at *14.[2] *Raoul* likewise explained that the "total number of games played in a best-of-seven matchup like the NBA Finals and the World Series" matters to the revenue of broadcasters, sponsors, arenas, and concession companies. 2026 WL 2969682, at *10.

The same is true for the three examples Defendants criticize. *See* Opp.15. Rotten Tomatoes scores reflect critical consensus, and one need not be an economist to know that movie reviews are potentially correlated with box office performance and the revenue of distributors,

[2] *Minnesota*'s analysis of the definition of "swap" did not turn on whether the court was "considering preexisting state gaming laws," Opp.17, but on the text of *federal* law.

cinemas, and brand partners. Margin of victory potentially matters to stadiums and nearby restaurants, whose revenue depends on whether fans stay for a close game. And which candidate wins the Senate election in Mahoning County, Ohio, potentially matters to the *national* economy. *See* A. Imwalle, *Republicans face wake-up call after Valley losses*, WKBN.com (Nov. 4, 2026) ("Nobody has ever won statewide without winning Mahoning County.").[3] Defendants argue that people engage in these transactions for "personal entertainment," Opp.15, but "a swap is a swap" even if it is a swap "people find entertaining and fun," *Raoul*, 2026 WL 2969682, at *10, *18.[4]

Defendants argue this interpretation is "inconsistent" with the other definitions which "refer almost exclusively to financial measures, indices, or instruments." Opp.19. That is incorrect. *See* 7 U.S.C. § 1a(47)(A)(iii) (including "weather," "energy," "agricultural," and "emissions" swaps). And Defendants' preferred reading would write subsection (ii) out of the statute: Neither Defendants nor the decisions they cite have ever provided a single example of a permissible event contract under (A)(ii) that would not also be a swap under either subsections (i) or (iii). For example, the Sixth Circuit identified "a change in interest rates" as a possible fit for (A)(ii). *KalshiEX LLC v. Schuler*, 192 F.4th 664, 684 (6th Cir. 2026). But subsections (i) and (iii) expressly cover interest rate swaps. 7 U.S.C. § 1a(47)(A)(i), (iii). By design, subsection (ii) "reads about as broadly as it could." *Raoul*, 2026 WL 2969682, at *7. Defendants' interpretation would read it out of the statute.

[3] https://www.wkbn.com/news/elections/republicans-face-wake-up-call-after-valley-losses/.

[4] Defendants also criticize what they call "parlays and props." Opp.16. But each contract Polymarket US lists turns on "the extent of the occurrence" of events with potential economic consequences, and Defendants identify no counterexamples. Regardless, the CEA's definitions of "swap" undoubtedly reach "a considerable swath" of event contracts, which is enough to enjoin Defendants' "across-the-board enforcement." *Minnesota*, 2026 WL 2150211, at *15. And the CEA expressly includes "any combination" of swaps in its broad definition. 7 U.S.C. § 1a(47)(A)(vi).

### 2. Event Contracts Are "Commonly Known To The Trade" As Swaps.

Additionally, the event contracts Defendants target are swaps because they have become "commonly known to the trade" as swaps. 7 U.S.C. § 1a(47)(A)(iv); *see* Mem.18-19. Defendants have no answer grounded in the statute. It is entirely irrelevant, for example, how swap would have "been understood" when Congress enacted Dodd-Frank. Opp.18. Congress included transactions that become commonly known as swaps "in the future." 7 U.S.C. § 1a(47)(A)(iv). What matters are the views of "the trade," *id.*, not supposed "common knowledge" or the opinions of "recreational gamblers," Opp.18. As the CFTC recently explained, "the actual practice of market participants," including "the CFTC, its registrants, and traders," as well as "the longstanding regulatory treatment of instruments by the CFTC" confirms that event contracts have become commonly known to the trade as swaps. 91 Fed. Reg. 66022, 66026 (Oct. 19, 2026).

Defendants say it is "simply untrue" that the CFTC has long exercised jurisdiction over event contracts. Opp.18. But the CFTC issued a no-action letter to Iowa Electronic Markets "to list event contracts tied to U.S. and Canadian elections" more than *thirty years ago*.[5] Before Dodd-Frank, the CFTC had "commenced a comprehensive review of the [CEA's] applicability to event contracts and markets." 73 Fed. Reg. 25669, 25670 (May 7, 2008). The year Dodd-Frank was enacted, the CFTC "approved event contracts on box-office receipts." 91 Fed. Reg. at 66026. And Polymarket US's parent company entered a consent decree with the CFTC agreeing to exit the United States because its "current events" event contracts "constitute[d] swaps," *In re Blockratize, Inc.*, 2022 WL 73864, at *1-2 (CFTC Jan. 3, 2022), and "[o]ffering these sorts of 'event contracts' typically requires registering as 'a designated contract market or swap execution facility' under

[5] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

the [CEA]," *Clarke v. CFTC*, 74 F.4th 627, 634 (5th Cir. 2023). The CFTC has since reaffirmed that determination and brought numerous insider-trading and other enforcement actions that depend on treating event contracts as swaps. *See* 91 Fed. Reg. at 66026.

Against all that, Defendants note that the CME Group's CEO once referred to certain sports-event contracts as "gambling." Opp.17. But CME itself has "self-certified numerous event contracts based on sports and elections as swaps." 91 Fed. Reg. at 66026.

Ultimately, Defendants' argument boils down to their view that "everyone" knows *sports-event* contracts are "sports bets." Opp.18. But their targets also include "culture, elections, and other events." Pet., Prayer ¶ A. And the looks-like-gambling argument is one States made about derivatives for decades—until Congress took contract-market-traded derivatives out of state hands. Mem.4-5. As reflected by the actions of the CFTC, investment decisions of institutional investors, and hedging done by a "wide array of market participants," Polymarket US's event contracts are "commonly known to the trade" as swaps. 91 Fed. Reg. at 66026.

**3. The Court Should Reject Defendants' Policy Arguments.**

Defendants say that interpreting "swap" to cover event contracts has no relation to Congress's goals in 7 U.S.C. § 5(a). Opp.19. But § 5(a) reflects Congress's findings of a "national public interest" in "providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." The implication that event contracts are not and cannot be used to manage risk is unsupported and untrue. *Supra* p.12. And price discovery and dissemination are the very mechanisms prediction markets rely on to generate reliable information about future events. Mem.8.

Citing *Loper Bright*, Defendants argue the Court should not defer to the CFTC's longstanding determination that the text of the CEA encompasses swaps traded on Polymarket US. Opp.12-13. But Defendants take the wrong lessons from *Loper Bright*. "[T]he longstanding

'practice of the government' . . . 'can inform a court's determination of what the law is.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). And *Loper Bright* reaffirmed that where the "statute expressly delegates to an agency the authority to give meaning to a particular statutory term," the "reviewing court" fulfills its role "by recognizing constitutional delegations." *Id.* at 394-95 (cleaned up). Here, the CEA expressly gave the CFTC authority to "further define the term[] 'swap.'" 15 U.S.C. § 8302(d)(1).[6] *Loper Bright* confirms that the Court should respect Congress's choice to do so.

Defendants say adopting Polymarket US's reading would make traditional sports wagering illegal. Opp.20-21. Whatever the merits of this supposed concern, it has been resolved by the CFTC. The agency's interim final rule confirms that traditional sports wagers are not swaps. 91 Fed. Reg. 65969 (Oct. 19, 2026). Defendants would have this Court ignore that rulemaking, citing *Ludlow*. Opp.20-21. But an interim final rule has the force of law upon its effective date. *Supra* p.8. And it reflects "reasoned decisionmaking" within the CFTC's purview. *Loper Bright*, 603 U.S. at 395. If Defendants object to the interim final rule, their remedy is a suit under the APA, not a collateral attack in this Court. *Supra* p.8.

Defendants argue the major questions doctrine applies. The argument presupposes, incorrectly, that the CFTC is relying on "old, ancillary language" to "federalize[] gambling." *Raoul*, 2026 WL 2969682, at *10. As the interim final rule makes plain, the CFTC is doing the opposite: States regulate traditional sports wagering; the CFTC regulates exchange-traded event contracts, regardless of whether some "[p]eople may view these contracts as gambling." *Id.* If the

[6] When acting alone, the CFTC's power to define terms is intended "to include transactions and entities that have been structured to evade" Dodd-Frank. 15 U.S.C. § 8321(b); *see* Opp.7. No such restriction attends the authority granted in § 8302 to further define "swap" through joint rulemaking with the SEC, the approach the CFTC has followed in its recent rulemakings.

doctrine *does* apply, Defendants never explain why the CFTC's power to prohibit "event contracts" involving "gaming," 7 U.S.C. § 7a-2(c)(5)(C), does not supply the clear statement Defendants demand.

**D. The CEA's Comprehensive Scheme Bars Defendants From Regulating The Field Of Event Contracts.**

The CEA's text, comprehensive structure, and purpose reflect Congress's intent to occupy the field of trading on designated contract markets. Mem.23-24. And Defendants' contention that the relevant field is state gambling law, Opp.25, misunderstands how field preemption works.

The "first step" is to identify the "field" "the federal government completely occupies." *Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 58 (2d Cir. 1984). That field's "boundaries" are based on "the federal statute itself." *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976). *Contra* Opp.25. Here, Congress has occupied the field of contract-market-traded derivatives, "except the limited powers expressly ceded to the states" in § 13a-2. *Suffolk County*, 728 F.2d at 58 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983)). Defendants' discussion of *other* fields—whether "gaming," the entire "field of futures trading," or the off-exchange trading addressed "in § 16"—goes nowhere. Opp.25-26.

"[T]he second step," the only step Defendants address, is "to see if [the state action] impermissibly intrudes in the federal area." *Suffolk County*, 728 F.2d at 58. "The test of preemption is whether the matter on which the state asserts the right to act is in any way regulated by the federal government." *Id.* (cleaned up). Here, Defendants assert the right to regulate the trading of event contracts on a contract market, the preempted field. Pet., Prayer ¶ A.

Defendants (Opp.25) would focus on "the target at which the state law aims," the "test for purposes of preemption in the *natural gas* context," *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373,

385-86 (2015) (emphasis added), but the outcome is the same. New York's gambling laws are so broadly worded that they "aim" at *all* derivatives, *see supra* p.1, as Defendants come close to admitting when they describe those laws as "regulat[ing] gaming, gambling, wagering, *and similar activity*," Opp.25 (emphasis added). When that supposedly "similar activity" takes place on a federally designated exchange, Defendants lose whatever "primary responsibility" they might otherwise have. *Id.*

Defendants' other arguments fare no better. Section 13a-2, *see* Opp.26, works against them. The decision to "expressly cede" "limited powers ... to the states" does not prevent Congress from "completely occupy[ing]" the remainder of the "given field." *Pac. Gas*, 461 U.S. at 212. Defendants cannot explain why Congress would grant States limited enforcement powers if States' remaining powers *weren't* preempted. *Supra* pp.4-5. The Special Rule might allow some "state laws to operate alongside the CEA," Opp.26, but it is "the Commission," not the States, that gets to determine whether those state laws warrant prohibiting the listing of event contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i); *see supra* pp.5-6. Finally, based on a nonparty affiliate's terms, Defendants assert that Polymarket US's "rules" make disputes with users "governed by New York law." Opp.26. That language is not in Polymarket US's Rulebook (Ex. 24). And the terms do not purport to apply New York law to *what* can be traded.

**E. New York's Laws Are Conflict Preempted.**

Defendants' efforts to enforce state gambling laws are conflict preempted under both obstacle and impossibility preemption. Mem.24-26.

*Obstacle.* Enforcement of state gambling laws does not "complement rather than conflict with federal law." Opp.27. Defendants' own enforcement action makes clear that New York law and federal law "'cannot be reconciled.'" *Id.* If New York may enforce its laws, every other State may too, each "attempting to exercise control over the operation of the trading of swaps on

federally regulated markets." *Raoul*, 2026 WL 2969682, at *15. For decades, courts have recognized that the CEA was designed to prevent just that. "[S]tate regulations [that] *add to* the CFTC's swap requirements for swap trading on designated contract markets" are preempted because they "cause conflict." *Id.* (citing *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992)); *accord*, *e.g.*, *Point Landing*, 795 F.2d at 422.

*Impossibility.* Defendants argue that impossibility preemption does not apply, even though the CFTC has interpreted its impartial-access requirement to forbid discrimination based on "location" within the United States. 91 Fed. Reg. 72407, 72409 (Nov. 10, 2026). The regulation requires "impartial access to [a contract market's] markets and services," and Defendants agree it forbids "*discriminatory* access requirements." Opp.29. The CFTC has taken the position that discrimination based on extraneous factors, whether economic means or location, is impermissible. This interpretation is not a "convenient litigating position." *Id.* It is a published interpretation in the Federal Register, issued by the agency charged with administering the impartial-access rule, and applying the agency's longstanding framework for the rule. *See* 91 Fed. Reg. at 72408.

The CFTC based its interpretation on the principle that "[d]erivatives markets must operate on a uniform basis at a national scale in order to achieve the CEA's purpose." 91 Fed. Reg. at 72409. Location-based requirements create potential liquidity risks. "For example, the exclusion of a region prone to extreme weather events from weather-related contracts would deprive that region's traders of a mechanism to hedge their exposures to such weather events." *Id.* If that concern is "hypothetical," Opp.29, it is because States began imposing such location-based restrictions only within the last year and a half.

## II. Polymarket US Will Suffer Irreparable Harm Absent An Injunction.

None of Defendants' arguments undermines Polymarket US's showing of irreparable harm. Opp.30-32. Defendants' conduct forces Polymarket US to confront the choice to keep

operating and "expose [itself] to potentially huge liability," or stop "during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). That is textbook irreparable harm, even though Polymarket US "may be heard in court" before penalties are imposed. Opp.30.

Defendants deny targeting "all" operations but seek to stop Polymarket US from operating in New York, where it serves customers nationwide. Opp.30; Lee Decl. ¶ 4. Their petition and proposed order reach contracts on "sports, culture, elections, and other events." Pet., Prayer ¶ A. Defendants identify no contracts that would remain. Opp.9 n.7, 30-31. And Defendants' fallback position (that Polymarket US could simply "move its offices," Opp.31) is supported by neither evidence nor common sense; even a temporary halt would trap customers in positions, drive them to competitors, and drain liquidity. Lee Decl. ¶¶ 9, 11-12. Such a "[m]ajor disruption . . . can be as harmful as termination." *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993).

Nor is the irreparable harm "self-inflicted." Opp.31. Polymarket US holds a CFTC designation and certifies each contract to the CFTC before listing it. Lee Decl. ¶¶ 3, 6. By Defendants' own account, contract markets "have been operating without objection in New York for decades," Opp.30, so Polymarket US had little reason to expect Defendants' about-face. And Defendants do not dispute that sovereign immunity bars recovery; they just say any losses are "speculative." Opp.32. Not so. The damage in lost business will far exceed "ordinary compliance costs." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171-72 (2d Cir. 2025). Those unrecoverable losses are irreparable. *Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020).

## III. The Equities And Public Interest Favor An Injunction.

Defendants say the equities track the merits. Opp.32. If so, the equities favor Polymarket US. Defendants' "sovereign interest in enforcing" their gaming laws, *id.*, does not extend to enforcing those laws where Congress has displaced them, and the public interest lies in the correct application of federal law. Mem.27-28; *Amarin Pharma, Inc. v. U.S. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015).

In any event, Defendants' public-harm evidence is wafer thin. For example, they cite an April 2025 bulletin on gambling helpline calls (published before Polymarket US was a designated contract market) for supposed "life-altering consequences." Opp.33; Ex. 27. That bulletin attributes the increase to "legalized mobile sports betting"—the regime *Defendants* license. Ex. 27 at 6. And Defendants' problem-gambling article acknowledges there has been "no substantive research" on prediction markets and gambling addiction. Ex. 29 at 6.

An injunction would leave in place the CFTC's regulatory safeguards. *Contra* Opp.33. The CEA requires every designated contract market to list only contracts "not readily susceptible to manipulation," to monitor trading to prevent manipulation and disruption, and to protect participants from abusive practices. 7 U.S.C. § 7(d)(3), (4), (12); 17 C.F.R. pt. 38. The CFTC enforces those duties, 7 U.S.C. §§ 9, 13a, 13b, and may prohibit certain event contracts it finds contrary to the public interest, *id.* § 7a-2(c)(5)(C). Defendants' preference for a different regulator does not justify overriding Congress's allocation of regulatory authority.

## IV. This Court May Grant Injunctive Relief.

Defendants argue this Court may not grant injunctive relief as to the Attorney General under the first-filed rule. Opp.33-34. That rule "has no import where, as here, the two cases at issue reside on the docket of the same district judge." *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 22 (2d Cir. 2018). And there is no basis to abstain under *Younger v. Harris* or deny

injunctive relief under the Anti-Injunction Act because, as Defendants concede, no state-court proceedings are pending. Opp.34-35. And there is no basis to remand. *See* Remand Opp., *James v. QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Nov. 5, 2026), Dkt. 26.

Even if this Court orders remand, neither *Younger* nor the Anti-Injunction Act would apply because this case would not return to state court immediately. Polymarket US would have a statutory right to appeal. 28 U.S.C. § 1447(d). And once Polymarket US dockets a notice of appeal, "an automatic stay of the district court's remand [is] effective." *Par. of Cameron v. Devon Energy Prod. Co., L.P.*, 193 F.4th 753, 756 (5th Cir. 2026); *accord City of Brunswick v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1243 (11th Cir. 2026); *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 272 (4th Cir. 2025). Defendants offer no basis to forestall injunctive relief solely because state proceedings might resume at some unknown date.

## V. No Bond Is Warranted.

Defendants identify no compensable loss they would incur from an injunction and propose no bond amount. Opp.35. The Court has "wide discretion" to dispense with a bond where there is "no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997). The State itself sought to shut down Polymarket US by temporary restraining order with no bond. Mem.11. The Court should waive the bond or set a nominal one without further briefing.

## CONCLUSION

The Court should grant a preliminary injunction.

November 23, 2026

Respectfully submitted,

By: /s/ Orin Snyder

GIBSON, DUNN & CRUTCHER LLP

Orin Snyder
Matt Benjamin
Rachel Jackson
Amanda LeSavage
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Attorneys for Plaintiff QCX LLC d/b/a Polymarket US*

**Admitted pro hac vice*

**<u>WORD COUNT CERTIFICATION</u>**

I, Orin Snyder, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this reply memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1(c) because it contains 5749 words, excluding the parts of the reply memorandum of law exempted from the word limit by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this reply memorandum of law.

Dated: New York, New York
November 23, 2026

*<u>/s/ Orin Snyder</u>*
Orin Snyder